RELIABLE FIRE EQUIPMENT COMPANY, Plaintiff-Appellant, v. ARNOLD ARREDONDO *et al.*, Defendants-Appellees.

Second District   No. 2—08—0646

Opinion filed December 3, 2010.—Rehearing denied January 12, 2011.

HUDSON, J., specially concurring.
O'MALLEY, J., dissenting.

Robert G. Black, of Law Offices of Robert G. Black, of Naperville, and Christopher P. Banaszak and Jennifer A. Farley, both of Reinhart, Boerner & Van Deuren, S.C., of Milwaukee, Wisconsin, for appellant.

Tom P. Gregory, Jack C. Lai, and Maria V. Vasos, all of Gregory & Lai, of Barrington, for appellees.

PRESIDING JUSTICE ZENOFF delivered the opinion of the court:

Plaintiff, Reliable Fire Equipment Co., appeals from an order of the circuit court of Du Page County entered on November 28, 2007, ruling that employment agreements entered into by the parties were unenforceable. Plaintiff also appeals from an order entered on June 12, 2008, directing a jury verdict in favor of defendants, Arnold Arredondo, Rene Garcia, and High Rise Security Systems, LLC (High Rise). We affirm.

## BACKGROUND

Plaintiff, which has its principal place of business in Alsip, Illinois, sells and services portable fire extinguishers, fire suppression systems, fire alarm systems, and other related products. Its business is commercial, and it sells fire alarm systems primarily to electrical contractors and building owners. It does the majority of its business in the Chicago area, northwest Indiana, and southern Wisconsin. At the time of trial, plaintiff employed 100 people.

Plaintiff hired Arredondo in 1998 as a salesman of fire alarm systems. Arredondo's duties were primarily to call on electrical contractors and building owners and "to go out and find business, sales." A sales quote to a potential customer would not always or automatically result in a sale. When he was hired, Arredondo had no discussions with plaintiff about an employment agreement. However, a week or 10 days into his employment with plaintiff, he was presented with an employment agreement he was asked to sign. According to Arredondo, "[I]t was a requirement that I sign the non-compete."

Plaintiff hired Garcia as a systems technician in April 1992 but, approximately a year or so later, asked him to move into sales, a position Garcia accepted. As a salesman, Garcia proposed projects, sent out pricing to electrical contractors, and estimated projects. Garcia worked in sales for approximately five years before plaintiff presented him with an employment agreement to sign, which he did on November 21, 1997. Plaintiff's salesmen were compensated by earning commissions, which

were various percentages of the gross profits on items or systems sold. The commissions were distributed quarterly, and salesmen took draws against commissions to tide them over between quarterly disbursements. If their draws exceeded the commissions, then the salesmen owed plaintiff the difference. At the time of the jury trial in 2008, both Arredondo's and Garcia's draws exceeded their commissions, although they were known as the top producers for plaintiff.

On August 17, 2004, Arredondo and Garcia signed an operating agreement for High Rise, which was formed on April 26, 2004, to be a major minority supplier of engineered fire alarm and related auxiliary systems throughout the Chicago metropolitan area. According to the organization papers for High Rise, filed with the Illinois Secretary of State on April 26, 2004, High Rise's management was vested in Arnold Arredondo, Rolando Arredondo, and Rene Garcia. Arnold Arredondo formulated a business plan for High Rise, which he used to obtain financing. High Rise would be plaintiff's competitor.

In August 2004, plaintiff's founder and chairman, Ernest Horvath, became concerned that Arnold Arredondo and Garcia were competing against plaintiff. Horvath testified that he asked Arredondo if he was going into the fire alarm business in competition with plaintiff and that Arredondo denied it. On September 1, 2004, Arredondo tendered his resignation from plaintiff, and he left its employment on September 15, 2004. Garcia remained employed with plaintiff until October 1, 2004, when he was fired for being suspected of competing against plaintiff. The record shows that High Rise generated substantial business as of September 22, 2004. Arredondo testified that he developed the business after he left plaintiff on September 15, and plaintiff took the position that Arredondo and Garcia must have diverted business from plaintiff to High Rise while they were still employed with plaintiff. Thus, the litigation began.

Ultimately, this case proceeded to a jury trial on plaintiff's second amended complaint, which was filed on April 7, 2006. The second amended complaint alleged generally that the employment agreements Arredondo and Garcia signed prohibited them from competing for a year in Illinois, Wisconsin, and Indiana after their termination of employment and that they solicited sales and customers while still employed by plaintiff, resulting in plaintiff's financial detriment. Count I alleged that Arredondo and Garcia breached a duty of fidelity and loyalty to plaintiff; count II alleged that Arredondo and Garcia engaged in a civil conspiracy to compete against plaintiff in violation of their employment agreements by soliciting plaintiff's customers, soliciting plaintiff's employees, and copying confidential information; count III alleged that Arredondo and Garcia breached their employ-

ment agreements; count IV alleged that Arredondo, Garcia, and High Rise tortiously interfered with plaintiff's prospective economic advantage when Arredondo and Garcia violated the employment agreements; count V alleged that High Rise tortiously interfered with plaintiff's employment agreements with Arredondo and Garcia; and count VI alleged that all three defendants were unjustly enriched when Arredondo and Garcia ceased devoting their full sales efforts on behalf of plaintiff.

Defendants answered the second amended complaint and filed affirmative defenses alleging that Arredondo and Garcia discharged and satisfied their duties as employees of plaintiff; the employment agreements were void or voidable for lack of consideration; the employment agreements were signed under duress; plaintiff violated the employment agreements by failing to pay earned commissions; plaintiff breached Garcia's employment agreement by failing to pay a severance benefit; plaintiff had unclean hands; and the employment agreements were contracts of adhesion and therefore void or voidable.

Prior to the filing of the second amended complaint, defendants filed a first amended counterclaim for declaratory judgment on December 16, 2005, seeking a declaration that the restrictive covenants in the employment agreements were unenforceable on the grounds that they did not protect a legitimate business interest (plaintiff's customers) and imposed an undue hardship on plaintiff's employees and the general public. On November 27, 2007, the trial court commenced a trial without a jury to determine the enforceability of the restrictive covenants.

Defendants' evidence showed the following. Plaintiff sells fire alarm systems manufactured by other companies. Plaintiff is one of approximately 75 entities that compete for business in the Chicago area. Generally, electrical contractors solicit bids from plaintiff and its counterparts, and the electrical contractors are accessible to plaintiff and its competitors by consulting the Yellow Pages, the Internet, industry directories, and signs in front of construction projects. Another method of locating electrical contractors who would be potential customers is to contact the union halls. Plaintiff kept a list of electrical contractors on a computer, which was available to everyone in plaintiff's employ. The products sold by plaintiff are not unique but can be purchased through other suppliers, and the lowest price for such products usually determines who gets the job. Costs associated with submitting quotes are fairly standard in the industry and are not confidential.

Plaintiff presented testimony that long-term customer relationships with electrical contractors and business owners are essential to

its business and that these relationships are developed and nurtured over time. Horvath testified that this relationship with his company, rather than strictly price, will determine plaintiff's success in getting a job and keeping the customer. For this reason, plaintiff invested time and money in marketing to its customer base. It does not share its internal costs with its competitors. While plaintiff's products are not necessarily unique, its ability to provide the services to support those products is unique in the industry.

For purposes of its ruling, the trial court found that plaintiff's customers were electrical contractors, that they were very well known to everyone in the industry through the Internet and publications, and that they did not restrict their bid solicitations to one supplier, so there was no near-permanent relationship between plaintiff and its customers. Second, the trial court found that plaintiff's pricing formula was a simple time and material computation and not confidential. Third, the court found that who plaintiff's customers were—electrical contractors or end users—was not clear, so the employment agreements were not understandable. Fourth, the court found that the employment agreements unlawfully restricted defendants from soliciting any of plaintiff's customers, not just those with whom the individual salesmen dealt. Fifth, the court found that the geographic restrictions were unreasonable, although it did not consider that dispositive "since I find that the other aspects of [the agreements] are unreasonable."[1]

On June 10, 2008, following jury selection, trial on the issues unrelated to the employment agreements commenced. David Ambler, who was employed by plaintiff at the same time as Arredondo and Garcia, testified that he walked into Arredondo's office on an unspecified date and overheard Arredondo on the telephone ordering a credit card machine. This information reached Ernest Horvath, who testified that in August 2004 he confronted Arredondo, who denied he was planning to go into business to compete with plaintiff. Horvath also confronted Garcia with the rumor that Garcia had solicited another employee to work for High Rise. Because it was "pretty obvious what was happening," Horvath fired Garcia. Debra Horvath, president of plaintiff, testified that Garcia's productivity declined beginning in

---

[1]In its ruling at the conclusion of the trial on the counterclaim, the trial court stated that "the entirety" of section 5 of the employment agreements was unenforceable. Later, on May 28, 2008, the trial court stated that its ruling "obviated any claims for any breach of the employment agreement." Again on June 10, 2008, the court ruled, "Anything that is based on the Employment Agreement, which I have ruled to be unenforceable, is out."

June 2004. Debra Horvath also noticed a decrease in fire alarm sales beginning in June 2004.

Arredondo testified that he became unhappy with working conditions in early 2004 and that he was negative in the draw, "deep in the hole." In December 2003, he had talked to people about seeking opportunities elsewhere. In March 2004, with the objective of becoming a major minority owner and supplier of fire alarm systems, he prepared a business plan in which he identified a customer base, by which he meant his own customer base in addition to plaintiff's. Arredondo testified that his quotes for jobs for plaintiff were $278,000 for August 2004 and $17,980 for September 2004. The September figure was so low because he tendered his resignation on September 1 and Ernest Horvath instructed him not to quote new jobs. Arredondo agreed that he signed the operating agreement for High Rise in August 2004. He also agreed that Horvath met with him in August 2004, but he denied that Horvath asked whether he was going into a competing business. Arredondo testified that he did not compete with plaintiff while he was still employed by plaintiff. He explained documents indicating otherwise by stating that the dates on those documents were incorrect, that a contractor soliciting High Rise's quote had asked that the quote be backdated, or that he asked a contractor to prepay an order. He denied that phone calls he made while employed by plaintiff to electrical contractors High Rise sold jobs to were related to those High Rise jobs. Arredondo received a letter from plaintiff dated September 30, 2004, in which plaintiff said it may pursue legal action against him, and at the end of 2004 he threw into the garbage a computer from which he had possibly transferred files.

Stephen Odenthal was a licensed private investigator and a forensic computer expert. On June 1, 2006, he made copies of four hard drives on computers belonging to Arredondo and Garcia. His analysis determined that information was wiped from Garcia's Gateway computer on October 27, 2004, and information on two of Arredondo's computers was wiped on February 7 and February 10, 2006. Because the purpose of the software used to wipe information from a hard drive is to eliminate or erase the information, Odenthal had no knowledge of what the wiped documents contained.

Garcia testified that he became unhappy working for plaintiff because the hourly employees were not supporting the commission salesmen, costing the salesmen their commissions when profits went down. He was fired on October 1, 2004. He signed the operating agreement for High Rise in order to have a backup plan in case he left plaintiff's employ. He continued to quote jobs for plaintiff until he left, and he was not quoting jobs for High Rise. On September 8, 2004, he

contributed $23,764 to High Rise. Garcia said that he might have told another employee in September 2004 that High Rise had lined up $300,000 in business. High Rise did about $1 million in business its first year. Garcia testified that the computer he used to write High Rise's quotes was later stolen. Garcia denied that he ever worked for High Rise while he was working for plaintiff.

Victoria Cory was a senior vice president for Prime Group Realty Trust. She identified plaintiff's exhibit 42, a group of documents relating to a project at 330 N. Wabash Avenue in Chicago. According to the documents, Prime Group Realty Trust was a partner of 330 N. Wabash Avenue, LLC, and entered into a "services agreement" with High Rise for the installation of a stairwell door unlocking system. She had no personal knowledge of the transactions depicted in exhibit 42 or the document preparation, but she testified that, according to the exhibit, High Rise was awarded the job sometime between September 15, 2004, and October 22, 2004.

Daniel Fellores was a design engineer working for plaintiff when Arredondo and Garcia were there. He recalled a conversation with Garcia, though not the date, in which Garcia told him that he and Arredondo "were going to start their own business." Garcia told Fellores they wanted to hire him as head engineer at $20 per hour, and Fellores told Garcia he would think about it. Fellores told Ernest Horvath about the conversation.

Robert Pikula, plaintiff's sales manager, testified that, typically, it might take a salesman four to six weeks to quote a job, depending on its size. He stated that the 330 N. Wabash job would have taken "a couple weeks worth of leg work" before the quote would be ready to submit to the customer. To go from a quoted job, in which the price is given to the customer, to a booked job, in which the installation has begun, takes six to eight weeks. In looking at the jobs High Rise booked by September 22, 2004, Pikula testified that it would be "pretty difficult" to have quoted and booked the jobs between September 15 and September 22. According to Pikula, Arredondo was never told to stop quoting jobs for plaintiff. While Arredondo was employed by plaintiff, he did not submit a quote on behalf of plaintiff for the 330 N. Wabash project, and when Arredondo turned the paperwork for the 330 N. Wabash project over to Pikula before Arredondo left, there was no time for plaintiff to submit a quote. Arredondo never told Pikula that High Rise was quoting the job. Pikula recalled that Arredondo left the office after 5 p.m. on September 15, 2004, his last day. Pikula testified that plaintiff experienced a downturn in sales after Arredondo and Garcia left and that it was "very difficult to replace two people with the experience they had." Arredondo's booked orders for plaintiff in the

month before he left were $800,000, and Garcia's booked orders as of the end of September 2004 were close to $1 million.

Tina Studzinski, plaintiff's controller, testified that she left work with Arredondo on September 15, 2004, his last day, at 5:15 p.m. She testified that when they left the company, Arredondo and Garcia each had a negative commission balance, which was not common among the salesmen. In August 2004 Arredondo submitted 14 quotes worth $278,369.75 on plaintiff's behalf, and Garcia submitted 5 quotes in September 2004 worth $51,304.

Curtis J. Reynolds was plaintiff's damages expert and last witness. He was an independent certified public accountant who concentrated his career in forensic accounting. He testified that he was asked to prepare a damages calculation for plaintiff "as a result of breach of fiduciary duty" by Arredondo and Garcia. He was commissioned to calculate plaintiff's gross profit loss at the time of Arredondo's and Garcia's departures or related to their "actions prior to their departure." He reviewed quotes and invoices issued by High Rise, financial statements for plaintiff, commission statements, deposition transcripts, pleadings, and "other accounting documents" at plaintiff's office. Reynolds calculated damages based on different categories. The first category was a gross profit loss on revenue shortfall for jobs listed as being in progress at High Rise as of September 22, 2004. That category resulted in a gross profit loss of $110,000 to $180,000, using two different gross profit ratios. One was the historical gross profit earned by plaintiff, and the second was the gross profit shown for the listing of jobs booked as of September 22, 2004, for High Rise. The profit margin Reynolds used for plaintiff was 17.28%. The profit margin he used for High Rise was 28.26%. The next category was the loss of gross profits on quotes that plaintiff "felt should have been issued on [its] behalf," which were High Rise's quotes as of September 22, 2004. That loss was $44,381. The next category was gross profit decline on actual sales in 2005. The decline was from 17% to 9.9%, in the amount of $189,642. The next category was plaintiff's loss of revenue in inspections, based on the premise that a loss of revenue in sales of fire alarm systems also resulted in a loss for inspections of those systems. That number was $52,380. The last category was commissions taken but not earned. The figure was approximately $24,000 for Arredondo and $1,874 for Garcia.

On cross-examination, Reynolds testified that he calculated plaintiff's gross profit loss on revenue shortfall using estimates of "sell" prices (what fire alarm systems would sell for) and estimates of costs. In Reynolds' calculation of gross profit decline on actual sales (of fire alarm systems), he included the year 2005, which was the year

after Arredondo and Garcia left plaintiff's employ. In calculating gross profit loss on quotes High Rise made as of September 22, 2004, Reynolds acknowledged that plaintiff did not make those quotes (and so could not have lost those jobs), but stated that he included them because plaintiff felt that "at least a portion of them or the large portion of them should have been made on [its] behalf." Reynolds agreed that Arredondo was legally allowed to do business on behalf of High Rise after he departed plaintiff, and Reynolds further agreed that his analysis did not show whether the quotes High Rise made as of September 22, 2004, were actually made before Arredondo left plaintiff's employ on September 15, 2004. Reynolds also acknowledged that, in calculating plaintiff's gross profit loss on the quotes made by High Rise as of September 22, 2004, he included quotes for minority jobs, although he had no understanding of whether plaintiff would have qualified for those jobs.

Defendants moved for a directed verdict based upon the above evidence. The trial court found that plaintiff presented a "dearth" of evidence that defendants competed with plaintiff between April 2004 (when High Rise was organized) and September 14, 2004 (the day before Arredondo's departure from plaintiff). The court further found that Reynolds' testimony was "based on impermissible estimates, speculation," and was "mixed in with all kinds of evidence that does not set out anything with regard to the dates these activities were performed." Based upon its findings, the court granted the motion for directed verdict.

Plaintiff filed a timely appeal.

## ANALYSIS

### The Directed Verdict

■ Plaintiff first contends that the trial court impermissibly directed the verdict in defendants' favor by weighing the credibility of the witnesses, which was the jury's function. In directing a verdict in a jury case, the trial court determines as a matter of law that there are no evidentiary facts out of which the jury may construe the necessary fact essential to recovery. *Sullivan v. Edward Hospital*, 209 Ill. 2d 100, 112 (2004). The motion should be granted where all of the evidence, viewed most favorably to the opposing party, so overwhelmingly favors the moving party that no contrary verdict based on the evidence could ever stand. *Townsend v. Fassbinder*, 372 Ill. App. 3d 890, 898 (2007). Despite defendants' suggestions to the contrary, our review is *de novo*. *Sullivan*, 209 Ill. 2d at 112; *Townsend*, 372 Ill. App. 3d at 898.

After the trial court ruled the employment agreements to be unenforceable in their entirety, plaintiff proceeded on the remaining

issues in the jury trial. Those issues were Arredondo's and Garcia's breach of the duty of loyalty (count I); tortious interference with prospective economic advantage (count IV); and unjust enrichment (count VI).[2] Proof on the elements of each count depended on the same evidence relating to Arredondo's and Garcia's conduct while employed by plaintiff, specifically between April 2004 and October 1, 2004, and Reynolds' testimony concerning damages. Plaintiff maintains that it presented "voluminous" evidence to support its claims and that the trial court ignored the "volumes" of evidence.

We disagree that the trial court improperly weighed the evidence. Rather, the trial court, especially with respect to the damages evidence, found that there was a total lack of competent evidence. Even granting plaintiff all the reasonable inferences from the evidence relating to Arredondo's and Garcia's activities, those inferences do not rise above the level of suspicion and speculation. On an unspecified date, Ambler overheard Arredondo on the telephone ordering a credit card machine. When asked if he intended to go into a competing business, Arredondo was untruthful about his intentions. Debra Horvath noticed a decrease in fire alarm sales in June 2004. Garcia spoke to Fellores at some unspecified time and said he and Arredondo "were going to start" their own business and wanted him to come to work for them. Arredondo explained why dates before September 15, 2004, appeared on some of High Rise's documents, and plaintiff did not impeach his testimony. Testimony about computers thrown in the trash and stolen and hard drives wiped was never linked to anything. Pikula surmised that the quotes made by High Rise as of September 22, 2004, must have been generated before Arredondo left plaintiff's employ, but, as the trial court pointed out, not one of plaintiff's customers testified that it was solicited while Arredondo and Garcia were employed by plaintiff. Cory, called to testify to the 330 N. Wabash project, had no knowledge of anything contained in the documents plaintiff introduced into evidence. Arredondo's and Garcia's declining performance was not linked to work on behalf of High Rise except by innuendo, and they both testified to the deteriorating working conditions they experienced with plaintiff. A jury cannot base its verdict on guess,

---

[2]Plaintiff asserts at page 23 of its opening brief that the count of civil conspiracy was also submitted to the jury. This is incorrect. The civil conspiracy alleged was an agreement to compete with plaintiff in violation of the noncompetition clauses of the employment agreements. The written order entered on June 12, 2008, granting the motion for directed verdict as to all six counts of the second amended complaint is also technically inaccurate because not all six counts were submitted to the jury.

speculation, or conjecture, but only on sound and substantial facts. *Yoder v. Ferguson*, 381 Ill. App. 3d 353, 372 (2008).

Even if we were to agree with plaintiff that its liability evidence was enough to go to the jury, its evidence of damages was based on incompetent calculations. Lost profits may be recovered when there are any criteria by which they can be estimated with reasonable certainty. *Apa v. National Bank of Commerce*, 374 Ill. App. 3d 1082, 1085 (2007). Here, Reynolds constructed five categories and calculated plaintiff's losses for each category. The first category was gross profit loss for revenue shortfall for the jobs listed in progress for High Rise as of September 22, 2004. Reynolds' calculations were based on estimates of sell prices and estimates of costs. He did not testify upon what those estimates were based. The next category was loss of gross profits on quotes plaintiff felt "should have been issued" on its behalf, which were made by High Rise as of September 22, 2004. First, quotes are not sales, and plaintiff offered no evidence either that it could have quoted those jobs or that it would have been awarded those jobs. Reynolds' own documents showed that plaintiff could not have been awarded the jobs that were marked "minority business enterprise." The next category was gross profit decline on actual sales in 2005. The relevant time period for calculating plaintiff's damages was between April 2004, when Arredondo organized High Rise, and October 1, 2004, when Garcia was fired. Lost profits in 2005 were not material. The next category was lost gross profits on inspections. The evidence showed that sales of fire alarm systems were usually accompanied by sales of servicing those systems. Reynolds did not establish the actual losses on sales, so his calculation of losses on the inspections was wanting also. The last category was commissions taken but not earned. Reynolds admitted that his analysis did not show whether the quotes High Rise made as of September 22, 2004, were done before or after Arredondo left plaintiff's employ, so his testimony that Arredondo and Garcia did not earn their commissions while working for plaintiff was speculative.

Plaintiff relies on *E.J. McKernan Co. v. Gregory*, 252 Ill. App. 3d 514 (1993), where this court held that an expert should have been allowed to testify to loss of projected sales based upon past sales. *McKernan*, 252 Ill. App. 3d at 540. *McKernan* is inapplicable here because Reynolds did not calculate either lost sales or previous sales. Instead, he used purported lost quotes. *McKernan* required that a plaintiff present competent proof of lost profits from which a reasonable basis of computation can be derived. *McKernan*, 252 Ill. App. 3d at 540-41. Plaintiff in this case failed to present such proof. Accordingly, the trial court did not err in directing a verdict in favor of defendants.

## The Enforceability of the Restrictive Covenants

Plaintiff's second argument is that the trial court's decision not to enforce the restrictive covenants in the employment agreements was against the manifest weight of the evidence. Arredondo and Garcia signed employment agreements that contained identical restrictive covenants. Section 5.1 of the agreements protected plaintiff's confidential property and information, and section 5.2 provided:

> "*Non-competition and non-solicitation*: During the term of Employee's employment hereunder and for a period of one (1) year after the date of his/her termination of employment for any reason, Employee will not, individually or on behalf of any proprietorship, partnership, corporation or any other person or entity:
>
> (a) Engage in any sales, sales support or sales supervisory capacity in any business in the states of Illinois, Indiana or Wisconsin which sells fire extinguishers, fire hoses, fire suppression systems, fire alarms, security systems, or other products which have been sold by the Corporation while Employee has been employed with the Corporation, to or for any person or entity who or which was a customer of the Company as of the date of Employee's termination (or within twelve (12) months prior to such termination date), or obtain or acquire any interest (whether as debt or equity), or provide services (whether as an employee, consultant or otherwise), in or to any such business.
>
> (b) Solicit (or assist others in soliciting) sales from any person or entity who or which was a customer of the Corporation as of the date of Employee's termination (or within twelve (12) months prior to such termination date).
>
> (c) Solicit (or assist others in soliciting), referrals from any person or entity who or which referred business to the Corporation as of the date of Employee's termination (or within twelve (12) months prior to such termination date).
>
> (d) Solicit (or assist others in soliciting), interfere with or cause any employee of the Corporation to leave his or her employment with the Corporation or to breach any agreement with or duty to the Corporation."

In Arredondo's and Garcia's declaratory judgment counterclaim, they alleged that plaintiff did not have a protectable interest in its customers and that section 5.2 of the agreements was unreasonable because it restricted them from competing against plaintiff in three states. In this appeal, plaintiff contends that the evidence showed that it has protectable interests in its customers and pricing information and its near-permanent customer relationships. Plaintiff concedes that the activity restrictions in section 5.2 of the agreements can be modified and the scope of the restrictions would remain reasonable.

## The Test to Be Applied in Determining the Reasonableness of the Restrictive Covenants

■ This court first espoused what is known as the legitimate-business-interest test in *Capsonic Group v. Swick*, 181 Ill. App. 3d 988, 993 (1989):

> "There are two general situations in which a legitimate business interest will exist: (1) where the customer relationships are near permanent 'and, but for his association with [plaintiff], [defendant] would not have had contact with the customers'; and (2) where the former employee acquired trade secrets or other confidential information through his employment and subsequently tried to use it for his own benefit. [Citation.]"

In *Lawrence & Allen, Inc. v. Cambridge Human Resource Group, Inc.*, 292 Ill. App. 3d 131 (1997), this court again embraced the test, and in *Dam, Snell & Taveirne, Ltd. v. Verchota*, 324 Ill. App. 3d 146 (2001), this court again applied the legitimate-business-interest test to determine the validity of restrictive covenants in employment agreements, utilizing it in a professional services case:

> "A postemployment restrictive covenant will be enforced only if reasonable, and that determination is a question of law. [Citation.] Covenants not to compete are, in effect, restraints on trade and will be carefully scrutinized to ensure that their intended effect is not the preclusion of competition *per se*. [Citation.] In determining the enforceability of a restrictive covenant in an employment setting, the test applied by Illinois courts is whether the terms of the agreement are reasonable and necessary to protect a legitimate business interest of the employer. [Citation.] There are two general situations in which a legitimate business interest will exist: (1) where the customer relationships are near permanent and, but for his association with the employer, the former employee would not have had contact with the customers; and (2) where the former employee acquired trade secrets or other confidential information through his employment and subsequently tried to use it for his own benefit. [Citation.]" *Dam, Snell & Taveirne*, 324 Ill. App. 3d at 151-52.

In 2003, this court once again applied the legitimate-business-interest test to affirm the trial court's grant of a preliminary injunction enjoining the defendant from soliciting, selling to, or servicing customers the defendant serviced while he was employed by the plaintiff. *Hanchett Paper Co. v. Melchiorre*, 341 Ill. App. 3d 345 (2003). We followed *Hanchett* in *The Agency, Inc. v. Grove*, 362 Ill. App. 3d 206, 214 (2005).

In the original briefing, both parties in this case accepted the legitimate-business-interest test (which was also employed by other

districts of the appellate court) as the appropriate test to be applied to the restrictive covenants in the instant case. On September 23, 2009, the Fourth District, which had explicated the legitimate-business-interest test in *Springfield Rare Coin Galleries, Inc. v. Mileham*, 250 Ill. App. 3d 922 (1993), rejected it in *Sunbelt Rentals, Inc. v. Ehlers*, 394 Ill. App. 3d 421 (2009), on the grounds that our supreme court has never "embraced" the legitimate-business-interest test and that the test is "inconsistent" with recent supreme court decisions. *Sunbelt*, 394 Ill. App. 3d at 428. The Fourth District concluded that our supreme court has approved only a time-and-territory analysis to determine the reasonableness of restrictive covenants in employment agreements.

While this court is not bound to blindly follow its own precedents, nor are we bound by decisions of other districts of the appellate court (*Schramer v. Tiger Athletic Ass'n*, 351 Ill. App. 3d 1016, 1020 (2004)), we are bound to follow decisions of the Illinois Supreme Court. *In re Clifton R.*, 368 Ill. App. 3d 438, 440 (2006). If the legitimate-business-interest test we used in *Capsonic, Lawrence & Allen, Dam, Snell & Taveirne, Hanchett,* and *Grove* is contrary to the dictates of our supreme court, then we must abandon that rule. For this reason, we ordered the parties in this case to file supplemental briefs discussing the impact of the *Sunbelt* decision. After considering the supplemental briefs, the oral argument, the special concurrence, and the dissent, we hold that the legitimate-business-interest test is viable.

## The *Sunbelt* Decision

Ehlers was a sales representative for Sunbelt and was subject to a written employment agreement that contained restrictive covenants providing that Ehlers would not, for a period of one year after the date of the expiration or termination of his employment, compete with Sunbelt within a 50-mile radius of any of Sunbelt's stores. *Sunbelt*, 394 Ill. App. 3d at 423-24. Within that 12-month time, Ehlers went to work for one of Sunbelt's competitors and was seen delivering merchandise to a Sunbelt client on behalf of his new employer. *Sunbelt*, 394 Ill. App. 3d at 424.

Sunbelt sued Ehlers and the new employer and sought injunctive relief. *Sunbelt*, 394 Ill. App. 3d at 425. The trial court found that the time-and-territory terms of the restrictive covenants were reasonable and refused to apply the legitimate-business-interest test on the basis that the time-and-territory test used by our supreme court in *Mohanty v. St. John Heart Clinic, S.C.*, 225 Ill. 2d 52 (2006), encompassed the legitimate-business-interest test. *Sunbelt*, 394 Ill. App. 3d at 425. The appellate court reviewed certain supreme court decisions dealing with

restrictive covenants (but notably not others, discussed below) and concluded from its selective review that courts, when presented with the issue of whether a restrictive covenant should be enforced, should evaluate only the time-and-territory restrictions and need not engage in the additional discussion regarding application of the legitimate-business-interest test "because that test constitutes nothing more than a judicial gloss incorrectly applied to this area of law by the appellate court." *Sunbelt*, 394 Ill. App. 3d at 431.

In its supplemental brief, plaintiff urges us to follow *Sunbelt*. It asks that we evaluate only the time-and-territory restrictions contained in Arredondo's and Garcia's restrictive covenants, which, it contends, meet the reasonableness requirement under *Sunbelt*, or remand this matter for the trial court to make a determination of reasonableness under *Sunbelt*. If we do not remand for a hearing under *Sunbelt*, then plaintiff urges that the proper analysis to be applied is to review the reasonableness of the time-and-territory restrictions under three criteria outlined in *Mohanty*, those being (1) whether enforcement of the restrictive covenants will cause undue hardship to Arredondo or Garcia; (2) whether their enforcement will injure the public; and (3) whether the restrictions are greater than necessary to protect plaintiff. Defendants ask us to reject *Sunbelt* because it defies decades of established precedent and applies only to medical employment contracts, such as the one considered in *Mohanty*.

We disagree with *Sunbelt* because, contrary to the historical evolution of the law of restrictive covenants, it disallows inquiry into whether the employer has an interest other than suppression of ordinary competition. As we discuss below, the *Sunbelt* approach, and the approach taken by the dissent, lead to a public policy favoring restraint of trade. Ultimately, we conclude that the legitimate-business-interest test grew out of the centuries-old Anglo-American policy against restraint of trade and that there is no reason to abandon it, although we later discuss its possible contours. Moreover, our research reveals that our supreme court has recognized that a distinct element of the analysis in determining the enforceability of a restrictive covenant is whether the restraint protects a legitimate interest of the promisee. Thus, we come to the conclusion that the legitimate-business-interest test is consistent with principles embraced by our supreme court.

## Restrictive Covenants in General

We will first examine common-law principles relating to restrictive covenants, and then we will examine applicable Illinois Supreme Court cases in light of those principles. For purposes of clarity and to provide

background, it is useful first to outline those principles as set forth in legal treatises.

■ "One of the oldest and best established of the policies developed by courts is that against restraint of trade." E. Farnsworth, Contracts §5.3, at 19 (3d ed. 2004). A promise is in restraint of trade if its performance would limit competition in any business or restrict the promisor in the exercise of a gainful occupation, and a promise that is unreasonably in restraint of trade is unenforceable. Restatement (Second) of Contracts §186 (1981).

In order for a promise to refrain from competition to be reasonable, the promisee must have an interest worthy of protection that may be balanced against the hardship on the promisor and the likely injury to the public. Restatement (Second) of Contracts §187, Comment b, at 39 (1981). Therefore, the restraint must be subsidiary, or ancillary, to an otherwise valid transaction or relationship or the restraint is unreasonable. Restatement (Second) of Contracts §187, Comment b, at 39 (1981). Examples of promises that are ancillary to a valid transaction or relationship are a promise by the seller of a business not to compete with the buyer in such a way as to injure the value of the business sold; a promise by an employee not to compete with his employer; and a promise by a partner not to compete with the partnership. Restatement (Second) of Contracts §§188(2)(a), (b), (c) (1981). For instance, in the sale of a business and its good will, a buyer's interest in what he has purchased cannot be realized unless the seller promises not to act so unreasonably as to diminish the value of what he has sold; in the case of a postemployment restraint, the restraint is justified on the ground that the employer has a legitimate interest in restraining the employee from appropriating trade secrets and customer relationships to which he had access in the course of his employment. Restatement (Second) of Contracts §188, Comment b, at 42 (1981).

Even if the restraint is no greater than necessary to protect the promisee's interest, that interest may be outweighed by the harm to the promisor and the likely injury to the public. Restatement (Second) of Contracts §188, Comment c, at 43 (1981).

The extent to which the restraint is needed to protect the promisee's interest is a critical factor in determining the reasonableness of the restraint. Restatement (Second) of Contracts §188, Comment d, at 43 (1981). The extent may be limited in three ways: (1) by type of activity; (2) by geographical area; and (3) by time. Restatement (Second) of Contracts §188, Comment d, at 43 (1981). Thus, to be valid, a restraint must be ancillary, it must protect some legitimate interest of the promisee, its scope must be reasonable in light of that

interest, and it must not cause unreasonable hardship to the promisor or to the public. E. Farnsworth, Contracts §5.3, at 28 (3d ed. 2004).

From the above, we glean that where the restraint is not necessary to protect a legitimate interest of the promisee, the inquiry will not reach whether the extent of the restraint is unreasonable. By the same logic, where the interest of the promisee is not in doubt or question, the inquiry may focus only on the extent of the restraint (or on the balance of hardships).

### Illinois Law

In *Linn v. Sigsbee*, 67 Ill. 75 (1873), our supreme court first considered the reasonableness of a restrictive covenant.[3] In *Linn*, both parties were practicing physicians. *Linn*, 67 Ill. at 77. Linn sold his house and lot to Sigsbee, and included in the sale was his medical practice. *Linn*, 67 Ill. at 77-78. The contract provided that Linn agreed not to establish a medical practice within the township of Chili or within six miles of the subject residence. *Linn*, 67 Ill. at 78. Sigsbee then sued Linn for breach of the restrictive covenant, and a jury found in Sigsbee's favor. *Linn*, 67 Ill. at 79. Linn appealed, arguing that the restraint imposed was unreasonable and that there was no valuable consideration. *Linn*, 67 Ill. at 80. The court stated:

> "The rule is well settled that any partial restraint of trade, or an agreement not to transact business at specified places, or with particular persons, or beyond a limited distance, or not to practice medicine within reasonable bounds, if there be some legal consideration for the restraint, will not invalidate the agreement. If there is a reasonable limitation only, and a consideration capable of supporting the agreement, it will be upheld. Courts will not inquire whether the consideration was adequate or equal in value to that which the party loses by the restraint. ***
>
> In this case the limitation was reasonable, as the practice was only prohibited in an area of six miles in all directions from the property purchased. *There were good reasons which induced the contract*, and there was a legal consideration." (Emphasis added.) *Linn*, 67 Ill. at 80-81.

Although not completely articulated, the rule gleaned from the Restatement and Farnsworth is present in *Linn*. The restraint was ancillary to the sale of the medical practice; it protected a legitimate interest of the promisee ("[t]here were good reasons which induced the contract"); the extent of the restraint was reasonable; and the

---

[3]In *Sunbelt*, the court stated that *Hursen v. Gavin*, 162 Ill. 377 (1896), was the earliest supreme court decision on point. *Linn* preceded *Hursen* by 23 years and was cited in *Hursen* (*Hursen*, 162 Ill. at 380-81).

restraint (being limited to six miles in all directions) did not cause an unreasonable hardship.

In *Hursen v. Gavin*, 162 Ill. 377 (1896), Hursen sold his livery and undertaking business to Gavin, and as part of the sale Hursen agreed not to engage in the livery and undertaking business in the city of Chicago for a period of five years. *Hursen*, 162 Ill. at 379. In an alleged breach of the agreement, Hursen opened an undertaking establishment on West Lake Street in that city, and Gavin sued for an injunction. *Hursen*, 162 Ill. at 378. The trial court issued an injunction, and the appellate court affirmed. *Hursen*, 162 Ill. at 379. On appeal to the supreme court, Hursen contended that the agreement not to engage in the livery and undertaking business for a period of five years was invalid as being in restraint of trade. *Hursen*, 162 Ill. at 379. Our supreme court recited the principles applicable to restrictive covenants:

> "The restraint is reasonable, *when it is such only as to afford a fair protection to the interests of the party, in whose favor it is imposed. If the restraint goes beyond such fair protection, it is oppressive to the other party and injurious to the interests of the public, and, consequently, void upon the ground of public policy.* A contract in restraint of trade, to be valid, must show that the restraint imposed is partial, reasonable and founded upon a consideration capable of enforcing the agreement. \*\*\* Where the restriction embraces too large a territory, it will be unreasonable and void as being wider than is necessary for the protection of the party in whose favor it is imposed, but where the restriction limits the exercise of the occupation within reasonable bounds, it is valid as being no larger than is necessary to protect the covenantee. [Citations.]" (Emphasis added.) *Hursen*, 162 Ill. at 380.

The court then discussed authorities dealing with time-and-territory restrictions. In holding that the restrictive covenant at issue was valid, the court said:

> "[The covenant] was only in partial restraint of trade. It was limited in time to the period of five years, and in space to the city of Chicago. \*\*\* Such an agreement was, in part, an inducement to appellee to make the purchase, and was based on a sufficient consideration. Appellant was at liberty to engage in any other business, or in the same business in any other place than Chicago. There was, therefore, only a limited restraint upon him as a tradesman, and not upon trade generally. Where one person is restrained from doing a particular business in a particular place, competition is left open to all others, and there is no injury to the public. The person restrained, in such case, merely yields to another the use of what he has disposed of to that other for value. *The limitation here did not go beyond what was necessary for the protection of appellee*

*in the prosecution of the business purchased by him, and was, therefore, reasonable."* (Emphasis added.) *Hursen,* 162 Ill. at 382. Again, in *Hursen* are the elements of the rule as set forth in the Restatement: (1) the restraint was ancillary to the sale of the livery and undertaking business; (2) the restraint was held to protect the interest of the appellee; (3) the extent or scope of the restraint was reasonable; and (4) the restraint did not impose a hardship on the appellant or the public.

We note two things about these early supreme court cases. First, in each, the restrictive covenant was ancillary to the sale of a business, and second, the interest of the promisee arising out of the transaction was not in question. Obviously, the purchaser of the medical practice (with its patients) and the purchaser of the livery and undertaking business (with its customers) had a legitimate interest in need of protection. See Restatement (Second) of Contracts §188, Comment *b*, at 42 (1981). Thus, the question turned on the reasonableness of the extent of the restraint. See also *Bauer v. Sawyer,* 8 Ill. 2d 351, 355 (1956) ("In determining whether a restraint is reasonable it is necessary to consider *** whether the restraint imposed is greater than is necessary to protect the promisee").[4] There is a similar pattern we see in later supreme court cases, but first we need to comment on *House of Vision, Inc. v. Hiyane,* 37 Ill. 2d 32 (1967).

*House of Vision* was an action to enforce an employee's covenant not to compete with his employer. The plaintiff was engaged in the business of selling spectacles, contact lenses, and other optical products, and one of the defendants was employed as a contact lens grinder and fitter. *House of Vision,* 37 Ill. 2d at 33-34. The employee's employment agreement forbade him, upon the termination of his employment, from engaging directly or indirectly in the same or a similar business as that of the plaintiff anywhere within a 30-mile radius from any location where the plaintiff rendered services at any time during the employee's employment. *House of Vision,* 37 Ill. 2d at 34. The employee resigned and went to work for one of the plaintiff's competitors within a 30-mile radius, and the plaintiff sued the former employee and his new employer to enforce the restrictive covenant. *House of Vision,* 37 Ill. 2d at 34. The trial court denied the injunction in part on the ground that the restrictive covenant was harsh and oppressive to the former employee. Specifically, without a time limitation, the covenant enjoined the defendants from soliciting patients or

---

[4]*Bauer* cited to language in *Ryan v. Hamilton,* 205 Ill. 191 (1903), which was *dicta,* the issue in *Ryan* being whether there was consideration for the restrictive covenant.

customers for whom the former employee had worked while employed by the plaintiff. *House of Vision*, 37 Ill. 2d at 34. The appellate court reversed and remanded for a full hearing before the master in chancery, after which the trial court granted the injunction for a period of 5 years and a radius of 25 miles. *House of Vision*, 37 Ill. 2d at 35.

The defendants directly appealed to our supreme court and argued that the trial court's modifications of the restrictive covenant impaired the obligation of the contract by imposing conditions to which the parties did not agree in lieu of the void conditions contained in the contract. *House of Vision*, 37 Ill. 2d at 37. Our supreme court reversed and remanded with directions to dismiss the complaint and assess fees. *House of Vision*, 37 Ill. 2d at 39-40. Our supreme court began its analysis with a discussion of the *legitimate interest* the restraint protected:

> "When a business is sold, restraints may be imposed to protect the value of the good will transferred [citation], and where specialized knowledge, such as secret processes or the like are involved, restraints may protect against the competition resulting from disclosure or appropriation. [Citations.]
>
> Those factors are not present in this case. *Here the interest to be protected was the interest of the plaintiff in its customers.* \*\*\*
> \*\*\*
> \*\*\* In the present case the restrictions clearly extend far beyond *those necessary to the protection of any legitimate interest of the plaintiff* \*\*\*." (Emphases added.) *House of Vision*, 37 Ill. 2d at 38-39.

Thus, in *House of Vision*, our supreme court explicitly considered the reasonableness of the time-and-territory restrictions (or lack thereof) only after it articulated the plaintiff's legitimate business interest. The first issue on appeal that the supreme court considered was whether the trial court had authority to refer the case to the master in chancery. *House of Vision*, 37 Ill. 2d at 35. Having decided that the trial court had such authority, the supreme court next considered whether the trial court's modification of the time-and-territory restrictions in the covenant impaired the parties' right to contract. *House of Vision*, 37 Ill. 2d at 36-37. In determining that the trial court should not have rewritten the contract, because the restrictions as embodied in the contract extended "far beyond those necessary to the protection of any legitimate interest of the plaintiff" (*House of Vision*, 37 Ill. 2d at 39), the court initially discussed the nature of the plaintiff's interest that needed protection. *House of Vision*, 37 Ill. 2d at 37-38.

After *House of Vision*, the supreme court decided *Canfield v. Spear*, 44 Ill. 2d 49 (1969), in which the court upheld the geographic limitation in a restrictive covenant but did not address the appellant's further contention that the covenant was void because the plaintiff had no legally protectable interest. However, in *Cockerill v. Wilson*, 51 Ill. 2d 179 (1972), our supreme court decided the validity of the geographic extent of a covenant restricting a veterinarian's practice, indicating that the plaintiff's interest in protecting his clientele justified the restriction. *Cockerill*, 51 Ill. 2d at 184 ("In considering this issue we must consider that the interest plaintiff sought to protect by the covenant was his interest in his clients"). Stating that the plaintiff was "naturally interested" in protecting his clients from being taken over by the defendant as a result of the contacts the defendant had developed through his association with the plaintiff, the court declared that "[t]he protection of this asset [the plaintiff's clientele] is recognized as a legitimate interest of the employer." *Cockerill*, 51 Ill. 2d at 184.

The case that brought the viability of the legitimate-business-interest test to the Fourth District's attention was *Mohanty*, decided in 2006. In *Mohanty*, the plaintiffs, who were physicians, sought a declaratory judgment that the restrictive covenants in employment agreements they signed were void, and the defendants, the employer clinic and its owner, counterclaimed for declaratory, injunctive, and other relief. The trial court held that the geographic restriction was reasonable but that the activity restriction was greater than necessary to protect the defendants' interests. *Mohanty*, 225 Ill. 2d at 61. The appellate court reversed, finding that the restriction on the practice of medicine within the narrowly drawn geographic limits would not cause undue hardship and was not greater than necessary to protect the defendants' interests. *Mohanty*, 225 Ill. 2d at 61-62. On appeal to the supreme court, the plaintiffs raised as their final contention that the restrictive covenants were unreasonably overbroad in their temporal and activity restrictions. *Mohanty*, 225 Ill. 2d at 75. In upholding the restrictive covenants, our supreme court specifically enunciated the defendants' legitimate interests as a separate factor:

> "[T]his court has a long tradition of upholding covenants not to compete in employment contracts involving the performance of professional services when the limitations as to time and territory are not unreasonable. [Citations.] ' "In determining whether a restraint is reasonable it is necessary to consider whether enforcement will be injurious to the public or cause undue hardship to the promisor, *and whether the restraint imposed is greater than is necessary to protect the promisee*." ' [Citation.]

\* \* \*

> *** *Thus, we find that the restraint on the practice of medicine, here, was not greater than necessary to protect the defendants' interests. This is particularly so because the restriction on plaintiffs is in effect only within a narrowly circumscribed area of a large metropolitan area."* (Emphases added.) *Mohanty*, 225 Ill. 2d at 76-77.

*Mohanty* followed in the vein of *Linn* and *Hursen* and is well within the rule of *House of Vision*.

It is essential to dwell on *Mohanty* for an extended analysis of that opinion because the court in *Sunbelt* concluded that the legitimate-business-interest test was antithetical to the criteria our supreme court enunciated, quoted above, in upholding the restrictive covenants in *Mohanty*. *Sunbelt*, 394 Ill. App. 3d at 430. The legitimate-business-interest test was developed by the appellate court to determine whether an employer has a protectable interest. As we shall see, the employer's protectable interest was not the focus of the supreme court's discussion in *Mohanty*, so that *Sunbelt*'s use of *Mohanty* to discredit the legitimate-business-interest test is misplaced.

We first look at what was before the supreme court in *Mohanty*. The plaintiffs appealed the appellate court's judgment reversing the trial court's denial of a preliminary injunction to the defendants to enforce the restrictive covenants contained in the plaintiffs' medical practice employment contracts. *Mohanty*, 225 Ill. 2d at 56. Therefore, when the case reached the supreme court, an injunction against the plaintiffs was in effect. The supreme court enunciated the issues raised in the appeal as follows:

> "Plaintiffs, in opposition to the injunction, ask this court to declare restrictive covenants in medical practice cases void as against public policy. In the alternative, plaintiffs argue that the restrictive covenants contained in their employment contracts are not enforceable because the restrictions are unreasonably overbroad in time and activity, or because the defendants materially breached the employment contracts, thereby discharging plaintiffs from their obligations under the contract." *Mohanty*, 225 Ill. 2d at 56.

In *Mohanty*, unlike the case at bar, the question of whether the employer had a protectable interest was not raised.

We next look at what *Mohanty* decided. The supreme court first concluded that the appeal was not moot as to Dr. Ramadurai, one of the plaintiffs, even though the restricted period of time during which he could not practice medicine under the employment contract had elapsed. *Mohanty*, 225 Ill. 2d at 63. The court then examined the enforceability of the restrictive covenants in the following context:

> "Plaintiffs affirmatively challenge the enforceability of the restrictive covenants, advancing three separate theories. First, they

contend that all restrictive covenants in physician employment contracts should be held void and unenforceable because they are against the public policy of this state. Second, plaintiffs contend that defendants materially breached the employment contracts, thereby relieving plaintiffs of their obligations under the restrictive covenants. Third, plaintiffs contend that the restrictive covenants in their employment contracts may not be enforced *because they are overly broad in their temporal and activity restrictions and, thus, unreasonable.*" (Emphasis added.) *Mohanty*, 225 Ill. 2d at 64. Again, we emphasize that the plaintiffs in *Mohanty* never challenged the defendants' (employer) protectable interest in their patients, thus conceding the point that is in contention in the instant appeal. Instead, the *Mohanty* plaintiffs contended that the restrictive covenants were void on public policy grounds because they interfered with the doctor-patient relationship, denied patients the freedom to choose their own physicians, created barriers to the delivery of quality medical care, hindered competition, caused patients to incur additional expense, and placed unreasonable limits on physician autonomy and freedom of movement. *Mohanty*, 225 Ill. 2d at 65-66. As an alternative to their public policy position, the plaintiffs argued that the *extent* of the restraint imposed by their employment contracts in terms of time and territory was unreasonable.

Our supreme court held that whether to prohibit restrictive covenants in medical practice contracts is a decision to be left to the legislature. *Mohanty*, 225 Ill. 2d at 70. The court then held that the trial court did not err in finding that the defendants did not breach the employment contracts. *Mohanty*, 225 Ill. 2d at 75. The court then reached the plaintiffs' final contention, which was "whether the restrictive covenants *** are unenforceable because they are unreasonably overbroad in their temporal and activity restrictions." *Mohanty*, 225 Ill. 2d at 75.

In analyzing the reasonableness of the temporal and activity restrictions, the supreme court stated, "[T]his court has a long tradition of upholding covenants not to compete in employment contracts involving the performance of professional services when the limitations as to time and territory are not unreasonable." *Mohanty*, 225 Ill. 2d at 76. In context, then, this statement was made (1) with respect to employment contracts in *professional services* cases and (2) with respect to the time-and-territory restrictions, *which were the only issues before the court.*

*Mohanty*'s lack of discussion of the existence of the defendants' legitimate interest did not herald a departure from the requirement of a legitimate interest as a separate factor in the enforceability analysis.

As we saw in the Farnsworth and Restatement examples above, to be valid, a restraint must be ancillary, it must protect some legitimate interest of the promisee, and its scope must be reasonable in light of that interest. The reasonableness of the restraint is reached only after it is determined that the restraint is ancillary and that a legitimate interest exists. In *Mohanty*, whether the restraint was ancillary and whether a legitimate interest existed were not at issue. Therefore, the reasonableness discussion in *Mohanty* cannot be conflated with a legitimate-interest analysis. *Sunbelt* conflated the two to reach an erroneous conclusion about *Mohanty*'s meaning.

That *Mohanty* did not involve the issue of whether a protectable interest existed, and therefore could not have spoken to whether the appellate court's legitimate-business-interest test is viable, is seen also in the special concurrence of Justice Karmeier, in which Justice Garman joined, and Justice Freeman's partial concurrence and partial dissent. In reminding us that the defendants in *Mohanty* had sought a preliminary injunction to enforce the restrictive covenants, Justice Karmeier pointed out that the plaintiffs did not dispute that the defendants had "a clearly ascertainable right in need of protection." *Mohanty*, 225 Ill. 2d at 80 (Karmeier, J., specially concurring, joined by Garman, J.). Justice Freeman acknowledged not only that the plaintiffs did not dispute the defendants' protectable interest, but that courts had recognized "the legitimate business interests that employers such as defendants wish to protect." *Mohanty*, 225 Ill. 2d at 93 (Freeman, J., concurring in part and dissenting in part).

The above discussion was necessary to show that decisions of our supreme court track the common-law rule that a restraint must protect some legitimate interest of the promisee. Indeed, the legitimate-business-interest test is rooted in the *Canfield* and *Cockerill* cases. *Nationwide Advertising Service, Inc. v. Kolar*, 14 Ill. App. 3d 522, 528 (1973).

> "In both *Cockerill* and *Canfield* the defendants were brought into contact with clients upon which the plaintiffs in those cases had spent considerable time and effort to attract. The defendants, newcomers to the area of their practice, had contact with clients because of their association with the longer established plaintiffs. The very nature of the professions in which those plaintiffs were engaged indicates that they could justifiably anticipate a permanent or near-permanent relationship with their clientele. The defendants undoubtedly would never have had contact with these clients had it not been for their association with the plaintiffs." *Kolar*, 14 Ill. App. 3d at 528.

The First District in *Office Mates 5, North Shore, Inc. v. Hazen*, 234 Ill. App. 3d 557 (1992), also traced the origins of the test back to *Canfield* and *Cockerill* and remarked that the "nature of the business" distinction "is evident throughout this State's case law on the subject." *Office Mates*, 234 Ill. App. 3d at 571.

*Sunbelt* seems to say that the employer's legitimate interest is whatever the parties agree to in the contract. *Sunbelt*, 394 Ill. App. 3d at 433 (holding that an employee has two options, not to sign the employment agreement or to ask to modify the terms of the restrictive covenants, but he does not have the option to sue to undo the contract unless the restrictions as to time and territory are unreasonable). If the employer's legitimate interest is a matter of contract only, then the quoted language in the above supreme court cases would be superfluous.

The legitimate-business-interest test grew out of the policy, rooted in centuries of common law and no less necessary today, of protecting a person's ability to pursue his or her chosen occupation. "It is a well-established constitutional principle that every citizen has the right to pursue a trade, occupation, business, or profession." *Alarm Detection Systems, Inc. v. Village of Hinsdale*, 326 Ill. App. 3d 372, 381 (2001). "[T]he right of an individual to follow and pursue the particular occupation for which he is best trained is a most fundamental right." *ILG Industries, Inc. v. Scott*, 49 Ill. 2d 88, 93 (1971). "Our society is extremely mobile and our free economy is based upon competition." *ILG*, 49 Ill. 2d at 93. The inquiry into whether the employer desires to prohibit competition *per se* or whether the employer has an interest over and above the stifling of competition is, therefore, logically a threshold question, although not always, as in *Lawrence & Allen*.

Under the English common law, a contract restricting a man's right to pursue his calling was void as against public policy. *Standard Newspapers, Inc. v. Woods*, 110 So. 2d 397, 399 (Fla. 1959). This policy was necessary because a man could not pursue a trade to which he was not apprenticed, and one so apprenticed was subject to penalty if he did not exercise that trade. *Standard Newspapers*, 110 So. 2d at 399. Consequently, an agreement to restrain him from following his trade would result in either his violation of the law or the deprivation of his right to earn a living. *Standard Newspapers*, 110 So. 2d at 399.

The employer's legitimate interest, or protectable interest, has persisted as a discrete question into modern times. " 'In all cases such as this, one has to ask one's self what are the interests of the employer that are to be protected, and against what is he entitled to have them protected.' " *Northwest Side Lumber Co. v. Layton*, 239 Ill. App. 82, 87 (1925), quoting *Herbert Morris, Ltd. Saxelby*, 1 App. Cas. [1916] 688

(H.L.). The Restatement states the proposition thusly: "If a restraint is not ancillary to some transaction or relationship that gives rise to an interest worthy of protection, the promise is necessarily unreasonable ***." Restatement (Second) of Contracts §188, Comment *b*, at 42 (1981).

The distinction between contracts that prohibit competition *per se* and those that are necessary to protect an employer from unfair competition has been drawn by holding that interests entitled to protection are those in trade secrets, such as secret processes of manufacture, and the interest in not having "old" customers enticed away. *Northwest*, 239 Ill. App. at 87-88. Thus, in this 1925 case, we see the skeleton of what became the legitimate-business-interest test. If the test presents a hurdle, then that is because an employer cannot by contract restrain ordinary competition. *Hasty v. Rent-A-Driver, Inc.*, 671 S.W.2d 471, 473 (Tenn. 1984). "In order for an employer to be entitled to protection, there must be special facts present over and above ordinary competition. [Citation.] These special facts must be such that without the covenant not to compete the employee would gain an unfair advantage in future competition with the employer." *Hasty*, 671 S.W.2d at 473.

Employers and employees are not on equal footing, as demonstrated by this case. The subject of the noncompete agreement was not raised with Arredondo until a week or 10 days after he had left his previous employment and joined plaintiff, when he was required to sign it. Garcia had been employed by plaintiff for approximately five years before he was presented with the noncompete agreement and was required to sign it. Neither Arredondo nor Garcia was in a practical position to refuse to sign the agreements or to negotiate better terms. In an economic climate where workers are desperate to keep their jobs, employers' requests easily become demands. This disparity was evident in *Lawrence & Allen*, where the employee "signed a postemployment restrictive covenant under the threat of termination and without any change to his job title, responsibilities, or salary." *Lawrence & Allen*, 292 Ill. App. 3d at 134.

We are here dealing with postemployment covenants not to compete in the area of sales of fire alarm equipment. This type of case is different from covenants not to compete in professional services cases such as *Mohanty*. The mistake *Sunbelt* made was to try to extrapolate from the professional services cases a rule that excludes the necessity of making a separate determination of whether there is a legitimate business interest in other types of cases, particularly in sales. As Justice Freeman noted, a legitimate business interest is presumed in a doctor's relationship with his patients. There was no

necessity in *Mohanty* to decide whether a legitimate business interest existed. Those engaged in professional services, by the nature of those services, can justifiably anticipate a permanent or near-permanent relationship with their clientele. *Kolar*, 14 Ill. App. 3d at 528. Consequently, the focus in determining whether a restrictive covenant in a professional services case should be upheld is on the time-and-territory restrictions. On the other hand, it is difficult to show a near-permanent relationship with customers of businesses that are engaged in sales. *Hanchett*, 341 Ill. App. 3d at 352. The "near-permanent" criterion is only another way of expressing the requirement that to be entitled to protection the employer has to show special facts over and above ordinary competition. In *Northwest*, "near-permanent" was expressed as "old" customers.

The special concurrence takes issue with the observations made in *Kolar* about the permanent or near-permanent nature of the relationship between those engaged in professional services and their clientele, and it questions whether this is true in modern times. As a case in point, the special concurrence cites an optometrist in a shopping mall. However, it would seem that it is less the location of the service provider than the nature of the services rendered that determines the relationship. The professional service provider undisputedly has a more intimate relationship with his or her patient or client than does a widget salesman with his or her customer. Persons who enter the shopping mall intending to buy Chanel No. 5 from one of several stores that sell perfume may also stop in to get their eyes checked while in the mall. However, because of the nature of the service, the customer is more likely to develop a relationship with the optometrist than he or she is with an individual salesperson behind the perfume counter. Having said this, we do not disagree with the special concurrence that the nature of the relationship is subject to factual proof.

This court in *Dam, Snell & Taveirne*, a professional services case, appreciated that demonstrating an employer's legitimate interest was required, because we used the legitimate-business-interest test in that case. Indeed, the legitimate-business-interest test as it has evolved is not some arbitrary high jump, but is a refinement of the common law in the service of the policy against restraint of trade. Application of the legitimate-business-interest test will not produce the same result in all cases. In *Hanchett* and in *Dam, Snell & Taveirne*, for example, this court upheld the restrictive covenants.

The legitimate-business-interest test need not be inflexible if broadly construed. In *Capsonic*, this court said that there are two *general* situations in which a legitimate business interest will exist, near-permanent customer relationships and where, but for his

relationship with the employer, the employee would not have had contact with the customers, and where the employee acquired trade secrets or other confidential information. *Capsonic*, 181 Ill. App. 3d at 993. We pointed out in *Lawrence & Allen* that a legitimate business interest is *generally* found to exist in those two situations. *Lawrence & Allen*, 292 Ill. App. 3d at 141-42. In *Office Mates*, the court stated that the determination "necessarily turns on the facts and circumstances of each case," but that the court had "long recognized" the two situations described above. *Office Mates*, 234 Ill. App. 3d at 568-69. Courts consider the nature of the business involved. *Office Mates*, 234 Ill. App. 3d at 571. Plaintiffs engaged in businesses that engender customer loyalty, as with unique products or personal services, tend to fare better under the legitimate-business-interest test than do businesses with customers who use many different suppliers simultaneously to meet their needs. *Office Mates*, 234 Ill. App. 3d at 571. However, no fast rules apply in regard to outcome, for as we said in *Hanchett*, to satisfy the near-permanency test a business need not "show that its customer relationships are perpetual or indissoluble, that it has an exclusive relationship with its customers, or that a near-permanent relationship existed with each customer." *Hanchett*, 341 Ill. App. 3d at 352.

We are aware that some opinions have set forth the two prongs of the legitimate-business-interest test as the outermost boundaries for determining when a protectable interest exists. See *Lifetec, Inc. v. Edwards*, 377 Ill. App. 3d 260, 269 (2007) (a legitimate business interest is found *only* where one of the two prongs is satisfied); *Appelbaum v. Appelbaum*, 355 Ill. App. 3d 926, 934 (2005) (there are two ways a party can establish that it has a protectable interest); *Grove*, 362 Ill. App. 3d at 214 (a legitimate business interest exists where one of the two prongs is met). The legitimate-business-interest test as it has evolved is relevant to the inquiry because, as we have demonstrated, it is consistent with principles espoused by our supreme court. However, in our view, those opinions like *Lifetec* and *Appelbaum*, which treat the two prongs of the legitimate-business-interest test as categorical pronouncements, may be unduly restrictive. Other criteria may exist that warrant protection under the law beyond those enumerated in the two traditional prongs of the legitimate-business-interest test. Yet, we find that no other interest has been established in the record beyond plaintiff's desire to shield itself from ordinary competition. Consequently, because the appellate court's development of the legitimate-business-interest test was neither alien nor impertinent, is consistent with principles espoused by our supreme court, and achieves the purpose of the policy against restraint of trade, we apply it here.

Before we engage in a discussion of how the legitimate-business-interest test applies to the facts of this case, we will discuss the dissent.

## The Dissent

Our state constitution and Illinois Supreme Court precedent refute the dissenting justice's claim that he is in the majority of the panel deciding this case and his grievance about the authorship of the majority opinion. Article VI, section 5, of the constitution provides in pertinent part:

> "Each Appellate division shall have at least three Judges. *** A majority of a division constitutes a quorum and the concurrence of a majority of the division is necessary for a decision." Ill. Const. 1970, art. VI, §5.

Pursuant to Illinois Supreme Court Rule 22(b) (eff. Dec. 1, 2008), a three-judge panel constitutes a division for purposes of rendering a decision in a case. Rule 22(c) (Ill. S. Ct. R. 22(c) (eff. Dec. 1, 2008)) provides that three judges must participate in the decision of every case and that the concurrence of two judges is necessary to a decision. Rule 22(c) implements section 1(d) of the Appellate Court Act (705 ILCS 25/1(d) (West 2008)), which makes clear that the concurrence of two appellate judges is a majority. Moreover, it is agreement as to the *judgment* that determines the majority:

> "Two requirements are necessary for an appellate court opinion. First, three judges must participate in the decision of every case. 145 Ill. 2d R. 22(c). Second, the concurrence of two judges in the judgment of the court is necessary. 145 Ill. 2d R. 22(c); Ill. Const. 1970, art. VI, §5; 705 ILCS 25/1(d) (West 1994). Absent the concurrence of at least two judges, the appellate court cannot render a valid judgment." *Proctor v. The Upjohn Co.*, 175 Ill. 2d 394, 396 (1997).

In our case, two judges agree to affirm the judgment of the trial court. The dissenting justice is, without question, in the minority.

The dissenting justice is also in the minority of this panel insofar as what he advocates in practical terms is the elimination of the employer's burden to prove that it has a protectable interest and, thus, the elimination of the doctrine against restraint of trade. The dissent is not consistent in naming this new approach. It is variously a totality-of-the-circumstances approach or a responsive-to-the-circumstances test. While the dissent says that the criteria of the legitimate-business-interest test are relevant in determining the existence of a protectable interest, it uses instead an examination of the

level of competition, expressed as "beyond-the-ordinary" competition, "fiercer-than-ordinary" competition, and "unfair [competition] in some manner." In practice, they all mean "any" competition whatsoever. The dissenting justice would find a protectable interest where the employer is "subjected" to competition in the form of "its former employees selling the same goods and services to the same customers."

While the dissent portrays itself as aligned with the special concurrence in its view of the legitimate-business-interest test, it in fact advocates a *Sunbelt* result and overstates the scope and breadth of the special concurrence's criticism of the legitimate-business-interest test. The special concurrence disagrees "with certain aspects of the legitimate-business-interest test" and believes that "the totality of the circumstances should control" (405 Ill. App. 3d at 751-52), but does not intend a dilution of the requirement that a protectable interest be something other than ordinary competition. 405 Ill. App. 3d at 752.

It is the lead opinion and the special concurrence that are in alignment in requiring the protectable interest to be something truly above ordinary competition. Moreover, the lead opinion takes the view that the legitimate-business-interest test can be read broadly enough to accommodate the totality of the facts and circumstances so that there is no need for a "new" test, or a new name for the same approach. The lead opinion and the special concurrence also agree that the facts of this case do not warrant reversal or remand. Consequently, the dissent's self-portrayal as part of the majority is unsubstantiated.

The dissenting justice proposes a remand of this case to the trial court with the purpose of allowing plaintiff another opportunity to prove the case it failed to prove the first time. The dissent suggests a remand to allow the trial court to consider the validity of the covenants under the "correct" legal standard and to receive additional evidence outside the two prongs of the legitimate-business-interest test.

First, as pointed out above, the lead opinion and the special concurrence agree that the interests identified by the legitimate-business-interest test warrant protection. Plaintiff presented evidence of the interests defined by the legitimate-business-interest test and has not suggested that it could have introduced other evidence. What additional facts would the trial court consider on remand?

In saying that the trial court could consider that defendants engaged in "stiffer-than-ordinary competition," the dissent would allow the trial court in essence to consider plaintiff's allegations that Arredondo and Garcia breached their duty of loyalty. The so-called "stiffer-than-ordinary competition" described by the dissent happens to be the evidence adduced by plaintiff (and found wanting by the trial

court) of Arredondo's and Garcia's alleged wrongdoing. In making this assertion, the dissent tries to graft an employee's duty in tort onto the concept of an employer's protectable interest in its effort to find a protectable interest in this case and, thus, to uphold the instant covenants. Breach of duty is a tort concept. A tort is a civil wrong, other than breach of contract, for which a remedy, usually money damages, may be obtained. Black's Law Dictionary 1526 (8th ed. 2004). It focuses on the failure of one to act as the law obligates one to act, whereas the present inquiry focuses on what economic interest over and above suppression of ordinary competition the employer can set forth to justify a restraint of trade. An employee's breach of his duty of loyalty to his employer may result in his having to pay damages as a result of that breach, but it cannot result in his servitude or loss of freedom to pursue his occupation. This is a notable example of the dissent's lip service to the special concurrence's approach while advocating a radical departure from centuries of common law.

Moreover, in arguing that the breach of the duty of loyalty is a factor the trial court could consider with respect to the enforceability of the restrictive covenants, the dissenting justice makes his own findings of fact when the trial court, in granting a directed verdict in the jury trial, found that plaintiff failed to prove these very allegations. The dissent tangles the evidence the trial court considered on the issue of the enforceability of the restrictive covenants with the evidence it considered in directing a verdict in the jury trial. The dissent then supplants the long-recognized deferential standard of review of manifest-weight-of-the-evidence with a new "totality-of-the-circumstances" standard of review, which is nothing more than review of the trial court's findings of fact *de novo*. 405 Ill. App. 3d at 753. Because the trial court's findings of fact do not suit the dissent's purposes, the dissent ignores those findings by fashioning a novel standard of review.

Second, neither party has requested that we remand for a new trial, or, in this case, trials, since there was a bench trial to determine the enforceability of the covenants at which the trial court made findings of fact followed by a jury trial on the remaining issues. We have the power to remand without determining and disposing of the case only "if the record is not in condition for the reviewing court to decide the question presented with justice to all the parties." *Inter-Insurance Exchange of the Chicago Motor Club v. Employers Mutual Casualty Co.*, 31 Ill. App. 3d 906, 909 (1975). Even in that circumstance, which is not present here, remand is appropriate where the additional evidence is documentary, its authenticity is not likely to be challenged, and the trial court can decide the issue as a matter of law without

undue inconvenience to the parties. *Inter-Insurance Exchange*, 31 Ill. App. 3d at 909. Remand is not appropriate where it would theoretically require "the cumbersome process of reconvening a jury." *Knauerhaze v. Nelson*, 361 Ill. App. 3d 538, 562 (2005). Here, the practical effect of a remand would mean that these litigants, who have already invested years and substantial attorney fees, would start over. Defendants would be entitled to conduct further discovery on any new evidence plaintiff might seek to introduce, and they would be entitled to rebut such evidence with their own. Far from clarity, the dissenting justice offers these litigants nothing but the uncertainty, peril, and the expense of further litigation. We point out that plaintiff asked us to remand for the trial court to apply the *Sunbelt* "reasonableness test." In the alternative, plaintiff argued that we should uphold the restrictive covenants based on *Sunbelt*. Instead of applying either *Sunbelt* or the legitimate-business-interest test, the dissent would impose a new test not advocated by either party.

The suggestion that plaintiff may raise additional evidence or new arguments in a petition for rehearing is unsound. The purpose of a petition for rehearing is to provide litigants with the opportunity to direct the reviewing court's attention to matters that it may have overlooked or misapprehended. *Proctor*, 175 Ill. 2d at 398 (Harrison, J., concurring in part and dissenting in part). Litigants are not entitled to a second day in court. See *Knauerhaze*, 361 Ill. App. 3d at 562. Litigants are, of course, entitled to seek review of this court's decisions either by filing a petition for leave to appeal to our supreme court (Ill. S. Ct. R. 315 (eff. Feb. 26, 2010)) or by requesting this court to issue a certificate of importance to the supreme court (Ill. S. Ct. R. 316 (eff. Dec. 6, 2006)).

Substantively, the dissent proffers a discordant philosophy. As discussed above, the legitimate-business-interest test was developed in the service of the doctrine against restraint of trade. "In this type of case, heavy procedural burdens impede the plaintiff employer." *Arthur Murray Dance Studios of Cleveland, Inc. v. Witter*, 105 N.E.2d 685, 693 (Ohio Ct. Com. Pl. 1952). As a consequence, to have a restrictive covenant upheld, the employer must show that its interest is greater than suppressing ordinary competition. Thus arose the requirement that the employer prove the existence of trade secrets, confidential information, or near-permanent customer relationships. The dissent says that these criteria remain relevant, but in practice the dissenting justice would abandon them.

What would replace the legitimate-business-interest test? We have to look at the way the dissent defines ordinary competition for the

answer. The dissent gives the example of three judges who exchange their robes for hard hats and slide rules. This example of ordinary competition describes competition so lacking in preparedness and expertise as to be no competition at all. The dissenting justice would protect the employer from everybody else who showed an ounce of competence in the employer's field. This is like saying that Fred Astaire should be protected against everybody except dancers who have three left feet. While the dissent says that it rejects *Sunbelt*, it proposes a *Sunbelt* result. As an example, the dissent would protect plaintiff from competition for its most recent customers regardless of how plaintiff got them and regardless of the nature of plaintiff's business. Like *Sunbelt*, the dissent really focuses only on the reasonableness of the time-and-territory restrictions. According to the low standard set forth by the dissent, a protectable interest is any interest advanced by the employer. This is evident in the dissent's definition of extraordinary competition as a former employee selling the same goods and services to the same customers without regard to the uniqueness of the goods or services or the manner in which the employer acquired the customers. Even *Sunbelt* does not go this far. *Sunbelt* at least relies on the freedom of contract to conclude that the employer's protectable interest is whatever the employee agrees to in the contract. Under the dissent's approach, the employee is left out of the equation altogether, guaranteeing the outcome in favor of the employer. This approach is subject to the criticism of inflexibility the dissent levels at the legitimate-business-interest test, as it admits the reasonableness of some level of restriction of competition in all cases. Where the restrictions go too far, the dissent gives the courts a blue pencil and license to rewrite the covenants.

Far from being a majority view, as the dissenting justice claims this to be, it is entirely outside the mainstream of legal thought and authority. The disfavor of covenants not to compete is traced back to the reign of Henry V. *Arthur Murray*, 105 N.E.2d at 691. There are models other than the legitimate-business-interest test for determining whether the employer has a protectable interest. The West Virginia Supreme Court of Appeals in *Reddy v. Community Health Foundation of Man*, 171 W. Va. 368, 298 S.E.2d 906 (1982), cited an economic-analysis approach that looks to the extent to which the employee has "paid for" the asset he seeks to use in the competitive market. *Reddy*, 171 W. Va. at 375, 298 S.E.2d at 912. The point here is that the dissent does not espouse the adoption of any other model. The dissent uses catch phrases like "stiffer-than-ordinary" competition," "extraordinary" competition, "fiercer-than-ordinary" competition, and "unfair" competition, but it never sets forth any criteria or standards by which

these levels of competition are met. Indeed, it does not draw upon any legal authority except to cite *dicta* from *Steam Sales Corp. v. Summers*, 405 Ill. App. 3d 442 (2010).[5]

In *Steam Sales*, the premise underlying its gratuitous comments regarding *Sunbelt* is its desire to relieve employers of the "greater hurdle" represented by the legitimate-business-interest test. *Steam Sales*, 405 Ill. App. 3d at 457-58. As we pointed out above, this "greater hurdle" is consistent with pronouncements of our supreme court, particularly in *House of Vision* where the high court equated the employer's legitimate interest with specialized knowledge such as secret processes. *House of Vision*, 37 Ill. 2d at 38-39.

While the dissent claims that *Steam Sales* supports its level-of-competition theory, *Steam Sales* does no such thing, but resolves the issue on appeal by applying the legitimate-business-interest test. *Steam Sales* never mentions or alludes to a "totality-of-the-circumstances test" or to a "level-of-competition" theory. While the dissent purports to recognize an employer's protectable interest as a gatekeeper to the further analysis of time-and-territory restrictions, *Steam Sales* explicitly rejects the notion of a protectable interest as gatekeeper, hence its quasi-embrace of *Sunbelt*. The dissent's disguise of its true purpose places it in a no-man's land, unable to lean on either the special concurrence or *Steam Sales* for legal or philosophical support.

To the extent the dissent suggests that this court is obliged to follow *Sunbelt*, it is in error. This court was never bound to follow *Sunbelt. Stare decisis* " ' "requires courts to follow the decisions of higher courts, but does not bind courts to follow decisions of equal or inferior courts." ' " *O'Casek v. Children's Home & Aid Society of Illinois*, 229 Ill. 2d 421, 440 (2008), quoting *Gillen v. State Farm Mutual Automobile Insurance Co.*, 215 Ill. 2d 381, 392 n.2 (2005), quoting *Schiffner v. Motorola, Inc.*, 297 Ill. App. 3d 1099, 1102 (1998). The opinion of one district, division, or panel of the appellate court is not binding on other districts, divisions, or panels. *O'Casek*, 229 Ill. 2d at 440. Also in error is the dissent's thesis that the lead opinion is in a minority. To date, more than a year after its publication, no other appellate district in Illinois has adopted *Sunbelt*. Accordingly, we will leave any repudiation of the legitimate-business-interest test to our supreme court.

Finally, some response, although limited, is appropriate to the dissenting justice's criticism of the way this case was assigned to the presiding justice as the author. By now it should be clear that Justices Zenoff and Hudson are a constitutional majority (see Ill. Const. 1970,

---

[5]We grant plaintiff's motion for leave to cite *Steam Sales* as additional authority.

art. VI, §5; 705 ILCS 25/1(d) (West 2008); Ill. S. Ct. Rs. 22(b), (c) (eff. Dec. 1, 2008). Moreover, the law review articles and treatises the dissenting justice cites either are inapplicable to the practices of this court or lend little support for his assertions. For example, while Aldisert is critical of a practice that assigns authorship of decisions before oral argument, he also points out that this procedure is designed to ensure an impartial method of assignment. R. Aldisert, Opinion Writing §3.4, at 34 (1990). Another example is the dissent's citation of a footnote in an article written by a law student at the University of Arizona. M. Hummels, *Distributing Draft Opinions Before Arguments on Appeal: Should the Court Tip Its Tentative Hand? The Case for Dissemination*, 46 Ariz. L. Rev. 317, 332 n.124 (2004). The dissent cites this footnote in support of its contention that a practice of early assignment can inhibit collegiality by fostering excessive reliance on the information provided by the assigned author. A close reading of the footnote and remainder of the article makes clear that the criticism discussed was in the context of a 1987 informal survey of judges and lawyers in the Arizona Court of Appeals, Division Two, and that the criticism was found to be unwarranted by another study conducted in conjunction with the 1987 survey. M. Hummels, *Distributing Draft Opinions Before Arguments on Appeal: Should the Court Tip Its Tentative Hand? The Case for Dissemination*, 46 Ariz. L. Rev. 317, 332 n.124 (2004). It is enough to say here that the arrangement of the three opinions in our case is in conformity with appellate court practice in this state. Separate opinions are designated as special concurrences or dissents solely based upon their authors' agreement or disagreement with the judgment entered by the majority—not the rationale for that judgment. Style Manual for the Supreme and Appellate Courts of Illinois 7 (3d ed. 1995).

### Whether Plaintiff at Bar Had a Legitimate Business Interest

We turn now to an application of the legitimate-business-interest test to the facts of the instant case. In this case, the facts relating to plaintiff's protectable interest were disputed. Therefore, we review the issue of the existence of a legitimate business interest under a manifest-weight-of-the-evidence standard but review *de novo* the question of whether the covenants were enforceable under the facts. *Grove*, 362 Ill. App. 3d at 215.

As we have seen, restrictive covenants are a restraint on trade, and courts will strictly construe them to ensure that their intended effect is not to prevent competition *per se*. *Hanchett*, 341 Ill. App. 3d at 351. To recap: there are two general situations in which a legitimate

business interest will exist: (1) where the customer relationships are near permanent and, but for his association with the employer, the former employee would not have had contact with the customers; and (2) where the former employee acquired trade secrets or other confidential information through his employment and subsequently tried to use it for his own benefit. *Dam, Snell & Taveirne*, 324 Ill. App. 3d at 152. In *Hanchett*, we set out seven factors that can be used to determine whether a near-permanent relationship exists: " '(1) the length of time required to develop the clientele; (2) the amount of money invested to acquire clients; (3) the degree of difficulty in acquiring clients; (4) the extent of personal customer contact by the employee; (5) the extent of the employer's knowledge of its clients; (6) the duration of the customer's association with the employer; and (7) the continuity of the employer-customer relationships.' " *Hanchett*, 341 Ill. App. 3d at 352, quoting *Audio Properties, Inc. v. Kovach*, 275 Ill. App. 3d 145, 148-49 (1995). This seven-factor analysis, however, is not the exclusive method of determining near-permanency, as courts also use a nature-of-the-business analysis, discussed below.

Section 5.1 of the employment agreements covers "Confidential Property and Information," and section 5.2 covers "Non-competition and non-solicitation." In its ruling, the trial court made separate findings with regard to each section.

The trial court first ruled that, in order to be confidential information under section 5.1 of the agreements, the information had to qualify as a trade secret pursuant to the Illinois Trade Secrets Act (765 ILCS 1065/1 *et seq.* (West 2008)). The court then analyzed section 5.1 under that criterion. However, plaintiff's second amended complaint did not include a count for misappropriation of confidential information, but pleaded causes of action grounded only in section 5.2 of the agreements. Because plaintiff did not sue for misappropriation of confidential information, the court's application of the Trade Secrets Act was not germane.

■ Nevertheless, whether plaintiff had protectable confidential information is part of the legitimate-business-interest test (*Dam, Snell & Taveirne*, 324 Ill. App. 3d at 151), which is used in deciding the enforceability of section 5.2 of the agreements. The analysis the trial court employed in applying the Trade Secrets Act is the same as that used in applying the legitimate-business-interest test. *Mangren Research & Development Corp. v. National Chemical Co.*, 87 F.3d 937 (7th Cir. 1996). Consequently, even though the Trade Secrets Act was not germane, the trial court's analysis was. The evidence showed that plaintiff's customer list was kept on a computer to which all employees had access. While the amount of expense and effort to cultivate

customers was disputed, the evidence demonstrated that sales of fire alarm systems were made by contacting electrical contractors and that the electrical contractors were widely known by people in the trade through the Yellow Pages and industry publications, such as the Blue Book. The evidence further showed that plaintiff's pricing information was not confidential, as putting together a quote was a function of estimating labor and materials, which are fairly standard in the industry. According to the evidence, pricing information was based on widely known or available information—manufacturer's suggested retail price less a standard discount coupled with the hourly rates of design and engineering personnel. Thus, the trial court's conclusion that plaintiff did not have protectable confidential information was not against the manifest weight of the evidence.

In analyzing section 5.2 of the agreements after hearing all of the evidence at trial, the trial court stated that it was left with the factual question of who were plaintiff's customers, referred to in section 5.2 of the agreements, and said that it was not made clear either in the agreements or in the testimony. Testimony was presented that plaintiff's customer relationships were established with electrical contractors, but that there were service contracts made with end users after the installation of particular systems. The trial court stated that, if it considered plaintiff's customers to be both electrical contractors and end users who signed service agreements, it would be grafting onto the parties' agreements "something that is not clear they agreed to." For this reason, the trial court found that the basic requirement that the agreements be understandable was not met. However, the court then went on to perform an analysis under the legitimate-business-interest test and assumed, for purposes of its discussion, that electrical contractors and not end users were plaintiff's customers.

For purposes of our discussion, we accept the trial court's assumption that plaintiff's customers were electrical contractors, which the evidence supports. Arredondo and Garcia, as plaintiff's salesmen, sold to electrical contractors, and defendants presented independent witnesses who worked in the industry and testified that electrical contractors were the persons to whom suppliers such as plaintiff sold their products.

■ Besides the existence of confidential information, the near-permanence of customer relationships is also considered in determining whether the employer has a legitimate business interest. *Dam, Snell & Taveirne*, 324 Ill. App. 3d at 152. The near-permanent requirement itself has two possible analyses: the nature-of-the-business test and the seven-factor test we used in *Hanchett*, which the trial court here used. Where the nature of the business is typified by a highly

competitive industry in which customers, through cross-purchasing, satisfy their buying needs, and businesses rely heavily on their sales forces and utilize basic sales techniques such as cold calls to make sales, the customers are not near permanent. *Office Mates*, 234 Ill. App. 3d at 572. Thus, sales (as opposed to professional services) will generally not as easily satisfy the near-permanent requirement. In *Lawrence & Allen*, this court applied the nature-of-the-business test and made the broad statement that "a near-permanent relationship with customers is generally absent from businesses engaged in sales." *Lawrence & Allen*, 292 Ill. App. 3d at 142.

In our case, the evidence showed that plaintiff's business was sales driven. Ernest Horvath admitted this in his testimony. Arredondo and Garcia made cold calls on electrical contractors, who engaged in cross-purchasing and whose identities were well known in the industry. It was also shown that plaintiff provided not a unique product, but one that was sold by other suppliers as well. However, we hesitate to end the discussion here, because in *Hanchett* we said that the seven-factor test was more appropriate than the nature-of-the-business test insofar as it provided a more complete analysis of the facts in that case. *Hanchett*, 341 Ill. App. 3d at 352. Moreover, the trial court applied the seven-factor test as the appropriate analysis in this case.

The trial court applied the seven factors and concluded that plaintiff did not have a near-permanent relationship with its customers. The evidence supports the trial court's conclusion.

Regarding the first factor, the number of years required to develop the clientele, the evidence showed that the salesman contacts electrical contractors and then may be invited to submit a quote for the project. The same contractor may also be accepting quotes from other sellers of fire alarm systems and will typically accept the lowest quote. Plaintiff's longevity in the industry is not the deciding factor in whether it gets a job. The second factor, the amount of money invested to acquire clients, does not weigh in plaintiff's favor. Plaintiff gave its salesmen a limited budget for entertaining, and Arredondo and Garcia supplied their own computers and cell phones. The cell phone package plaintiff supplied did not cover all of the salesmen's costs. As to the third factor, the degree of difficulty acquiring clients, the evidence showed that the clients were readily known from telephone and business directories and were acquired by submitting the most attractive quote. The fourth factor, the extent of personal customer contact by the employee, was extensive. Arredondo and Garcia were available all hours, seven days a week, to take care of customers. The fifth factor, the extent of the employer's knowledge of the customer, is not germane, because plaintiff does not provide personal services to the

customer and the customer may also be doing business with plaintiff's competitors. Regarding the sixth factor, the duration of the customer's association with the employer, the evidence showed that there is no exclusivity in the relationship, but that it depends on price. Factor number seven, the continuity of the employer-customer relationship, does not weigh in plaintiff's favor, because there is no guarantee that a contractor will use plaintiff for all of its jobs. Thus five of the seven factors weigh against plaintiff.

There is a second prong of the near-permanent analysis, which is whether Arredondo and Garcia would have had contact with plaintiff's customers absent their association with plaintiff. See *Dam, Snell & Taveirne*, 324 Ill. App. 3d at 152.

> "When the names of an employer's customers are easily ascertainable from telephone and professional directories or are generally well known by an employer's competitors, the employer will generally be unable to satisfy that the employee would not have had contact with the customers but for the employee's employment with the employer." *Lawrence & Allen*, 292 Ill. App. 3d at 143.

Here, plaintiff cannot satisfy the "but-for" test. The evidence showed that Arredondo and Garcia likely would have had contact with plaintiff's customers because of the readily accessible public directories listing electrical contractors.

In this case, the evidence showed that the industry was highly competitive, the identity of customers was well known in the industry, plaintiff relied heavily on its sales people, and customers cross-purchased. Under these conditions, the near-permanent criteria are not met. See *Lawrence & Allen*, 292 Ill. App. 3d at 142.

■ Because plaintiff cannot demonstrate a protectable interest, that is, one over and above the suppression of ordinary competition, to justify a restraint of trade, it is unnecessary to proceed to a time-and-territory analysis. However, such an analysis also leads to the conclusion that the restrictive covenants in this case are unenforceable. The one-year restriction after termination from employment is reasonable, and defendants concede this. The trial court found that the activity restriction, though, is unreasonable because the covenants against competing and soliciting apply to all customers of plaintiff, not just those with which Arredondo and Garcia dealt. Activity restrictions, such as restrictions on competing or soliciting, should be narrowly tailored to protect only against activities that threaten the employer's interest. *Lawrence & Allen*, 292 Ill. App. 3d at 140. The restrictions must be reasonably related to the employer's interest in protecting the customer relations that its employees developed as a direct result of the employment. *McRand, Inc. v. van Beelen*, 138 Ill. App. 3d 1045,

1057 (1985). In our case, section 5.2 of the agreements prohibits competing with plaintiff or soliciting any person or entity that was a customer of plaintiff's, not only those with which Arredondo and Garcia personally dealt.

The *McRand* rule is intertwined with the geographic scope of the restrictions because the employee should be excluded only from the territory where he was able to establish a certain relationship with the employer's customers. *McRand*, 138 Ill. App. 3d at 1057-58.[6] A complete lack of geographic scope may be determinative where the restrictions are greater than the area that the employee served on behalf of the employer. *McRand*, 138 Ill. App. 3d at 1057-58. Here, the trial court found that 95% of plaintiff's business came from the Chicago area, including northwest Indiana and southern Wisconsin. Therefore, the restriction on the entire states of Illinois, Wisconsin, and Indiana is not reasonable, because it excludes defendants from working in territories beyond where Arredondo and Garcia established relationships with plaintiff's customers.

■ Plaintiff's last argument is that the trial court improperly dismissed its claims that Arredondo and Garcia breached section 1 of the employment agreements. Plaintiff cites no legal authority in support of its argument and has, thus, forfeited it. A point raised in a brief but not supported by citation to relevant authority is forfeited. *Lozman v. Putnam*, 379 Ill. App. 3d 807, 824 (2008). Accordingly, we hold that the trial court did not err in ruling that the restrictive covenants in the employment agreements were unenforceable.

## CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Du Page County is affirmed.

Affirmed.

JUSTICE HUDSON, specially concurring:

I agree with much of the authoring justice's analysis of this appeal. I write separately because I believe that a few points bear further emphasis. To begin with, I share the dissent's concern regarding the viability of the legitimate-business-interest test. The Fourth District of this appellate court has flatly rejected this test (see *Sunbelt Rentals,*

---

[6]The trial court expressed "serious questions" about the enforceability of the three-state restriction (Illinois, Wisconsin, and Indiana) contained in the instant employment agreements, but it did not strike down the agreements on that basis.

*Inc. v. Ehlers*, 394 Ill. App. 3d 421, 431 (2009)), and it would seem an appropriate time to assess whether this district should adhere to it.

The authoring justice traces the test to *Capsonic Group v. Swick*, 181 Ill. App. 3d 988 (1989). 405 Ill. App. 3d at 721. As such, it is a relative newcomer to the law. Indeed, as the Fourth District points out, the supreme court has never "embraced" this test. *Sunbelt*, 394 Ill. App. 3d at 431. It is worth noting that the supreme court has never expressly rejected it either. Something our supreme court has recognized is the need for an employer to have some legitimate, protectable interest in order to enforce a covenant not to compete. See *Cockerill v. Wilson*, 51 Ill. 2d 179, 184 (1972) ("Plaintiff was naturally interested in protecting his clients from being taken over by defendant as a result of these contacts. The protection of this asset is recognized as a legitimate interest of an employer"). Recently, in *Mohanty v. St. John Heart Clinic, S.C.*, 225 Ill. 2d 52, 77, 79 (2006), in analyzing the enforceability of a covenant not to compete, our supreme court stated that the covenant "was not greater than necessary *to protect [the employers'] interests*" and that the geographical restriction contained in the covenant "was reasonable and necessary *to protect the [employers'] interests.*" (Emphases added.) Thus, it is clear enough to me that an employer must have some protectable interest at stake before we will enforce a covenant that bars a former employee from pursuing his or her customary line of business. Consequently, I cannot accede to the holding in *Sunbelt* that "courts at any level, when presented with the issue of whether a restrictive covenant should be enforced, should evaluate *only* the time-and-territory restrictions contained therein." (Emphasis added.) *Sunbelt*, 394 Ill. App. 3d at 431.

As the authoring justice amply points out, such covenants have historically been disfavored. 405 Ill. App. 3d at 721-22. Courts have always been cautious regarding what sorts of interests the law will protect. It has thus been observed that a covenant not to compete should not be used to shield an employer from ordinary competition. *Abbott-Interfast Corp. v. Harkabus*, 250 Ill. App. 3d 13, 17 (1993) ("Courts uphold only those noncompetition agreements which protect the employer's legitimate proprietary interests and not those whose effect is to prevent competition *per se*"). It is this concern that the legitimate-business-interest test was intended to vindicate.

Near the conclusion of the section in which she discusses the viability of the legitimate-business-interest test, the authoring justice responds to the charge that the test is inflexible. She points out that there are no "fast rules" that control the analysis regarding the adequacy of the employer's interest. Indeed, as she points out, "the determination 'necessarily turns on the facts and circumstances of

each case.' " 405 Ill. App. 3d at 736, quoting *Office Mates 5, North Shore, Inc. v. Hazen*, 234 Ill. App. 3d 557, 568-69 (1992). I agree wholeheartedly with these observations. However, in practice, the proposition articulated in *Office Mates* has been more the exception than the rule. Indeed, in arguing that the legitimate-business-interest test, as it exists, is flexible, the authoring justice can point only to *Office Mates* and the fact that some cases preface the legitimate-business-interest test with qualified language such as "generally." See 405 Ill. App. 3d at 736.

Contrast this meager support for the notion that the legitimate-business-interest test is flexible with the myriad of cases that set it forth as a *sine qua non* for the enforcement of a covenant not to compete. For example, in *Lifetec, Inc. v. Edwards*, 377 Ill. App. 3d 260, 269 (2007), a majority of a panel of the Fourth District held: "A 'legitimate business interest' is found *only* where (1) the employee acquired confidential information through his employment with the plaintiff and later attempted to use it for his own gains or (2) by the nature of the plaintiff's business, its customer relationships are near permanent and the employee would not have had contact with the customer absent his employment." (Emphases added and omitted.) *Lifetec, Inc.* cited *A.J. Dralle, Inc. v. Air Technologies, Inc.*, 255 Ill. App. 3d 982, 991 (1994), where this court stated, "Our courts will enforce a restrictive covenant under two types of circumstances: (1) where the former employee acquired confidential information through employment and subsequently attempted to use it for his own gains, or (2) where, by [the] nature of the business, the customer relationship is near permanent and, but for his association with [the] plaintiff, [the] defendant would not have had contact with the customers in question." Similarly, the First District has held that "[t]here are two ways a party can establish that it has a protectable business interest: (1) it can show the employee acquired the party's confidential information and attempted to use that information for his own benefit; or (2) it can show it has a near-permanent relationship with its customers, and but for his employment with the party, the employee would not have had access to those customers." *Appelbaum v. Appelbaum*, 355 Ill. App. 3d 926, 934 (2005). In *The Agency, Inc. v. Grove*, 362 Ill. App. 3d 206, 214 (2005), we flatly held, "A legitimate business interest exists where: (1) because of the nature of the business, the customers' relationships with the employer are near-permanent and the employee would not have had contact with the customers absent the employee's employment; or (2) the employee gained confidential information through his employment that he attempted to use for his own benefit." Far more often than not, the legitimate-business-interest test has been

presented as representing the only two circumstances under which an employer can enforce a covenant not to compete.

The authoring justice states that the prongs of the legitimate-business-interest test should not be taken as "categorical pronouncements." 405 Ill. App. 3d at 736. In so doing, she appears to be departing from a large body of cases applying the test in an inflexible manner, *sub silentio*, in favor of a proposition that has been articulated only infrequently, namely, that the enforceability of such covenants should be judged with reference to the totality of the circumstances (see *Office Mates*, 234 Ill. App. 3d at 569). In any event, I agree with the result at which the authoring justice arrives and I agree that the test that should be used to assess restrictive covenants is more flexible than the legitimate-business-interest test as typically presented. Rather than engaging in a *post hoc* revision of the test, however, I would plainly hold that the existence of a legitimate business interest should be determined with regard to the totality of the facts and circumstances of a given case (see *Office Mates*, 234 Ill. App. 3d at 569). Analyzing such covenants with reference to the totality of the circumstances to determine if an employer has a protectable interest, as opposed to utilizing the typical rigid version of the legitimate-business-interest test, will lead to results more grounded in the true considerations of a given case.

The dissent is concerned that our three opinions result in a confusing statement of the law and worries that the lead opinion might be taken as a correct statement of the law. It would appear, however, that a careful reading of the three opinions in this case makes clear that this district is no longer committed to a strict application of the two restrictive prongs of the legitimate-business-interest test.

By advocating a totality-of-the-circumstances approach over the extant legitimate-business-interest test, I do not mean to say that the sorts of interests identified by that test do not warrant protection. Indeed, the nature of the relationship between an employer and its customers (be it near permanent, completely transient, or something in between) and the danger of misuse of confidential information are potential parts of the totality of the circumstances that must be considered. I would further emphasize that, contrary to the Fourth District's apparent position in *Office Mates*, 234 Ill. App. 3d at 571, the parties cannot define the legitimate interests of the employer in the covenant itself. Quite simply, there are public policy considerations beyond freedom of contract that are relevant as well—perhaps most notably, free trade.

Having set forth my disagreement with certain aspects of the legitimate-business-interest test and my belief that the totality of the

circumstances should control, I do agree with the authoring justice's assessment of the facts of this case. Her discussion of the facts reveals neither a sufficiently substantial relationship between plaintiff and its customers nor the danger of the misuse of any confidential information that would warrant the enforcement of a restrictive covenant. Furthermore, I perceive no other factor, beyond the two traditionally discussed in the context of the legitimate-business-interest test, that indicates that plaintiff has some special interest that is in need of protection. Accordingly, the effect of enforcing the covenants would have been only to shield plaintiff from ordinary competition. Having concluded that plaintiff possesses no protectable interest in this case, there is no need to address whether the restrictions contained in the covenant are reasonable in scope.

Though the dissent and I agree that the existence of a protectable interest should be assessed in light of the totality of the circumstances, I do not intend a dilution of the dignity of the sorts of interests the law will protect through the enforcement of a restrictive covenant. To this end, I believe that cases applying the legitimate-business-interest test provide considerable guidance in exemplifying the types of interests the law will protect as matters of fact. I believe there may be other interests that are comparable to the two identified in the legitimate-business-interest test, and my disagreement with the test is that it excludes consideration of such interests as a matter of law.

Plaintiff has requested that we remand this case so that the trial court can apply the proper test to analyze the validity of the restrictive covenant. However, "the question of whether a covenant is enforceable under the facts is a legal question subject to *de novo* review." *The Agency, Inc.*, 362 Ill. App. 3d at 215. Plaintiff has not explained why we cannot conduct this analysis in the first instance or identified any other compelling reason for us to remand. If such reasons exist, plaintiff remains free to call them to our attention in a petition for rehearing.

Before concluding, however, I wish to address one additional point. I believe that the following statement is not necessarily true: "Those engaged in professional services, by the nature of those services, can justifiably anticipate a permanent or near-permanent relationship with their clientele." 405 Ill. App. 3d at 735. The authoring justice cites *Nationwide Advertising Service, Inc. v. Kolar*, 14 Ill. App. 3d 522, 528 (1973), a case that is over 35 years old. While this proposition may have been true at that time, it seems an overstatement at the present time, when many individuals, for example, find their optometrist in a shopping mall. In short, I do not believe that professional services indicate substantial relationships as matters of law. Rather, such

determinations should be made as matters of fact. *Cf. Mohanty*, 225 Ill. 2d at 76-77 (examining the nature of the professional service involved rather than simply accepting it as establishing a sufficient interest).

JUSTICE O'MALLEY, dissenting:

I respectfully dissent from the result in this case, but I agree with the special concurrence's explication of the law. With that agreement, I am actually in the majority regarding the legal issues and analysis raised by this case, even though my opinion, if the reader has not yet given up, comes last. I am dissatisfied with the confusing formal structure of this disposition, so to help the reader's understanding, I first count noses. The lead opinion and the special concurrence agree as to the outcome: affirmance of the trial court and the holding that the restrictive covenants in this case are unenforceable. They constitute the majority only as to the outcome, however. The lead opinion maintains its adherence to the legitimate-business-interest test (LBI test) (see 405 Ill. App. 3d at 736 ("we apply it [the LBI test] here")),[7] in spite of the significant criticism from the special concurrence, myself, and the recent precedent of *Steam Sales Corp. v. Summers*, 405 Ill. App. 3d 442 (2010). The special concurrence and I agree that the LBI test must be abandoned in favor of what we term to be a totality-of-the-circumstances approach, in which the existence or lack of a protectable interest is first ascertained, followed by consideration of the time, territory, and activity restrictions of the restrictive covenant. The special concurrence and dissent, therefore, form the majority on the significant legal issue decided in this case.

There is, of course, no doubt that the lead opinion and the special concurrence form the majority because both vote to affirm the judgment of the trial court. That does not mean, however, that the lead opinion constitutes the majority opinion. See, *e.g.*, 405 Ill. App. 3d at 748 ("I share the dissent's concern regarding the viability of the legitimate-business-interest test"); 405 Ill. App. 3d at 751 ("a careful reading of the three opinions in this case makes clear that this district is no longer committed to a strict application of the two restrictive prongs of the legitimate-business-interest test"). As I have noted, the special concurrence (which votes to affirm) and the dissent (which

---

[7]The lead opinion's use of "we" is curious indeed as Presiding Justice Zenoff is the only one to retain the LBI test. The special concurrence arrives at the same result, but applies the totality-of-the-circumstances approach. The dissent also applies the totality-of-the-circumstances approach, but comes to a different result than the lead opinion and the special concurrence.

votes to reverse) agree on the legal analysis of the issues. In other words, the special concurrence presents the only opinion in this case in which a majority of the court agree on both the legal analysis and the outcome. The lead opinion's pretension to the majority, then, is unfounded, because the special concurrence truly represents the majority opinion of this panel and this court.

In addition, the lead opinion concludes that "[t]he dissenting justice is, without question, in the minority." 405 Ill. App. 3d at 737. This is tautological, as my separate opinion in this matter is styled as the dissent, which would necessarily place it in the minority. This statement also illustrates the lead opinion's primary shortcoming, namely, that it makes assertions and conclusions without regard to any underlying circumstances. As I will demonstrate, the special concurrence and the dissent both agree on the manner in which the law should be analyzed and what the law should be. In my understanding, where two judges on a three-judge panel agree, that constitutes the majority. The lead opinion disagrees with the manner in which the special concurrence and dissent analyze the law and their conception of what the law should be. On that issue (and I emphasize that it is the issue, not the entirety of the disposition), the lead opinion is in the minority.

Having first tried to explain how to assess the actual holdings of our three opinions in this case, I turn to the substantive issues raised. As our three opinions indicate, the chief debate in this case is over the retention or repudiation of the LBI test. As the special concurrence correctly notes, the Fourth District recently challenged the legitimacy of the LBI test in *Sunbelt Rentals, Inc. v. Ehlers*, 394 Ill. App. 3d 421 (2009). Both the lead opinion and special concurrence trace the development of the LBI test. The LBI test looks to two prongs only: (1) whether the employee acquired confidential information through his employment and subsequently attempted to use it for his own ends, or (2) whether, by the nature of the business, the relationship between employer and customer is near-permanent, and, but for his association with the employer, the employee would never have come into contact with the clients in question. *Nationwide Advertising Service, Inc. v. Kolar*, 28 Ill. App. 3d 671, 673 (1975). As the special concurrence points out, *Sunbelt* rejected the LBI test because the supreme court never embraced or otherwise adopted it. 405 Ill. App. 3d at 748-49. The special concurrence also correctly notes that the supreme court did not reject the LBI test either.

By analyzing various cases (*e.g.*, *Cockerill v. Wilson*, 51 Ill. 2d 179 (1972); *Mohanty v. St. John Heart Clinic, S.C.*, 225 Ill. 2d 52, 77 (2006)), the special concurrence correctly notes that our supreme

court has required an employer to demonstrate the existence of a protectable interest before it will enforce the employer's restrictive covenant. Indeed, *Mohanty* states the test to consider the propriety of a restrictive covenant as follows: " ' "In determining whether a restraint is reasonable it is necessary to consider whether enforcement will be injurious to the public or cause undue hardship to the promisor, and whether the restraint imposed is greater than is necessary to protect the promisee." ' " *Mohanty*, 225 Ill. 2d at 76, quoting *House of Vision, Inc. v. Hiyane*, 37 Ill. 2d 32, 37 (1967), quoting *Bauer v. Sawyer*, 8 Ill. 2d 351, 353 (1956). While the concept of a protectable interest is not expressly present in *Mohanty*, it is nevertheless, as noted by the special concurrence, present. I further agree completely with the special concurrence's repudiation of *Sunbelt*'s holding that " 'courts at any level, when presented with the issue of whether a restrictive covenant should be enforced, should evaluate *only* the time-and-territory restrictions contained therein.' " (Emphasis in original.) 405 Ill. App. 3d at 749, quoting *Sunbelt*, 394 Ill. App. 3d at 431.

While neither I nor the special concurrence will go as far as *Sunbelt* in repudiating the LBI test, we both maintain that, nevertheless, the LBI test is narrow, inflexible, and an artificial impediment to considering restrictive covenant cases on their full facts. In any formulation, the LBI test refers to confidential information or near-permanent customer relationships; most cases assert that the LBI test can be satisfied only by showing that the employee used confidential information or the employer had a near-permanent relationship with its customers. See, *e.g.*, *Lifetec, Inc. v. Edwards*, 377 Ill. App. 3d 260, 269 (2007) (a protectable interest is found "only" where the employee acquired the employer's confidential information or where the employer's customer relationships are nearly permanent); *Appelbaum v. Appelbaum*, 355 Ill. App. 3d 926, 934 (2005) (there are two ways to establish a protectable interest). Even the cases that do not expressly limit themselves to "only two ways" to demonstrate a protectable interest analyze only whether there is confidential information or near-permanency of customer relationships. *E.g.*, *Lawrence & Allen, Inc. v. Cambridge Human Resource Group, Inc.*, 292 Ill. App. 3d 131 (1997); *Capsonic Group v. Swick*, 181 Ill. App. 3d 988 (1989).

In spite of this rigidity and inflexibility, the lead opinion purports to discern that the LBI test is somehow flexible, in spite of the fact that, for literally all the cases that have invoked the LBI test, those cases have analyzed only the confidential information prong or the near-permanency of customer relationships prong, and no other. The lead opinion accomplishes this linguistic legerdemain by seizing on a very few cases that articulate the LBI test with "general" or "gener-

ally." *Lawrence & Allen*, 292 Ill. App. 3d at 141 ("Generally, there are two situations in which a legitimate business interest will exist ***"); *Capsonic*, 181 Ill. App. 3d at 993 ("There are two general situations in which a legitimate business interest will exist ***"). The lead opinion combines a curious mix of sophistry with a fervent wish to believe in an attempt to beguile the unreflectingly credulous into agreement.

The special concurrence, fortunately, does not fall prey to this beguilement. It notes that a "myriad of cases" set forth the two prongs of the LBI test as the *"sine qua non* for the enforcement of a covenant not to compete." 405 Ill. App. 3d at 750. I completely agree. The special concurrence also notes the lengths to which the lead opinion will go to preserve the formalism of the LBI test, even while its literal words actually gut it to create something truly unprecedented and completely at odds with the precedent on which it purports to rely. Specifically, the special concurrence states that the lead opinion:

"states that the prongs of the legitimate-business-interest test should not be taken as 'categorical pronouncements.' [Citation.] In so doing, [it] appears to be departing from a large body of cases applying the test in an inflexible manner, *sub silentio*, in favor of a proposition that has been articulated only infrequently, namely, that the enforceability of such covenants should be judged with reference to the totality of the circumstances." 405 Ill. App. 3d at 751.

In other words, the special concurrence is calling out the lead opinion's attempt to overthrow precedent through twisting those cases that employ "generally" while trying to maintain the appearance of staid conformity with now-abandoned precedent. The lead opinion's silence in response to this point speaks volumes about the legitimacy of its contention.

The special concurrence abjures such *post hoc* revisionism (405 Ill. App. 3d at 751), in favor of a plain statement that "the existence of a legitimate business interest should be determined with regard to the totality of the facts and circumstances of a given case" (405 Ill. App. 3d at 751). Again, I completely agree. The LBI test should be discarded. The special concurrence advocates the analysis of a restrictive covenant "with reference to the totality of the circumstances to determine if an employer has a protectable interest." 405 Ill. App. 3d at 751. I completely agree. Obviously, confidentiality or near-permanent customer relationships would be considered under the totality of the circumstances and would go a long way toward demonstrating the existence of a protectable interest. But, as the special concurrence notes, they are no longer the only two ways to demonstrate a protectable interest.

In spite of stating a new analytical paradigm for restrictive covenants, the special concurrence finds the restrictive covenants at issue in this case to be unenforceable. At this point, I disagree. The lead opinion and special concurrence deem defendants' conduct to be ordinary competition. While this is in accord with the trial court's factual findings, I believe that the trial court's factual findings cannot be accepted (in spite of the against-the-manifest-weight-of-the-evidence standard of review), because the trial court analyzed the evidence that was presented only in light of the LBI test, and not considering the totality of the circumstances, which a majority of this panel now requires. This fact alone makes a strong argument for remanding this matter to allow the trial court to consider the validity of the restrictive covenants under the correct legal standard (and also to allow the parties to present any additional evidence (outside of the LBI-test prongs of confidential information and nearly permanent customer relationships) that may now be relevant to the enforceability of the restrictive covenants). After all, the use of the wrong legal standard constitutes error under any standard of review. *E.g.*, *Rockford Police Benevolent & Protective Ass'n v. Morrissey*, 398 Ill. App. 3d 145, 154 (2010) (an abuse of discretion will be found where the court applied the wrong legal standard). Of course, the trial court was blameless in applying the LBI test in this case because that was then the law. Although it is not clear—given the odd notion of having the lead opinion present itself as the "majority" even though, as to the issue of determining a protectable interest, it is actually in the minority—a majority of this panel has now decreed that the LBI test is no longer valid. See 405 Ill. App. 3d at 751 ("this district is no longer committed to a strict application of the two restrictive prongs of the legitimate-business-interest test").

The lead opinion (405 Ill. App. 3d at 736) and the special concurrence (405 Ill. App. 3d at 752) both believe that the circumstances of this case present only ordinary competition, something against which a restrictive covenant may not shield an employer. While I agree that a restrictive covenant may not restrict "ordinary competition," I disagree that this case presents ordinary competition between the employer and the former employees. What is ordinary competition? I do not have a universal definition. However, something squarely within the definition of ordinary competition would be, as an example, the three judges on this panel deciding to doff our robes and enter the fire alarm and suppression business.[8] Even if we were to open a business next door to plaintiff, our competition with plaintiff would fall into the

---

[8]Obviously, it might be more realistic to use experienced fire alarm and suppression equipment salesmen to give an example of ordinary competition.

category of ordinary competition. By contrast, individuals who worked for an employer for a significant length of time, who learned the employer's business as a result of their employment, and who decided to leave the employer in order to open their own competing business, delivering exactly the same goods and services as the employer and targeting exactly the same customers as the employer, are not engaged in "ordinary" competition. The example of not-ordinary competition is far closer to the circumstances of this case than is the example of ordinary competition.

In this case, the evidence showed that Arredondo and Garcia not only left to open their own shop, but, while employed with plaintiff, were working on soliciting business for their soon-to-start business. For example, by September 15, 2004, Arredondo and Garcia had left plaintiff's employment. By the following week, September 22, 2004, the new company, High Rise, had generated substantial business. Plaintiff sought to create the inference that Arredondo and Garcia had been diverting business from plaintiff to their new business while still employed by plaintiff. In support of that inference, plaintiff presented testimony that it takes six to eight weeks to go from giving the price to the customer to the customer accepting the quote and then beginning the installation. In addition, it would take a "couple" weeks of research and "legwork" before the quote would be ready to submit to the customer. Plaintiff presented testimony that it was interested in a job located at 330 N. Wabash Avenue in Chicago. Arredondo was preparing the paperwork to submit a quote on the Wabash project. When Arredondo completed his employment, he turned the paperwork on the Wabash project over to Pikula, but there was insufficient time remaining before the deadline for plaintiff to be able to submit a quote on the Wabash project. High Rise was awarded the contract for the Wabash project. The trial court rejected the inference that plaintiff was attempting to demonstrate. Nevertheless, and despite the fact that the trial court was concerned only with whether defendants had used confidential information or whether plaintiff maintained a nearly permanent relationship with its customers, this evidence is unquestionably pertinent to whether defendants were engaged in ordinary competition with plaintiff, something the trial court was not considering because it was analyzing the evidence under the LBI test.

In arriving at its decision, the trial court did not look beyond the prongs of the LBI test to determine whether defendants were engaged in ordinary competition with plaintiff. In other words, the trial court did not consider the evidence using the lens of the correct legal analysis, the totality of the circumstances, as promulgated by the special concurrence and supported by this dissent. Had it done so, my

view is that it unquestionably would have determined that plaintiff's evidence supported a finding that defendants engaged in stiffer-than-ordinary competition and could not be considered to be engaging in "ordinary" competition with plaintiff. This beyond-the-ordinary level of competition should trigger the protection of the restrictive covenants to which Arredondo and Garcia agreed.

On the other hand, the evidence about the beyond-the-ordinary level of competition was not really relevant to any aspect of the LBI test. The trial court was correct to disregard or downplay the significance of the evidence because it was looking to determine only whether defendants used confidential information or whether plaintiff's customers were nearly permanent, because those were the only bases the court could consider under the LBI test. Had it been aware that it could expand its consideration, in my view it would have accepted the inference plaintiff sought to draw and found that defendants were not engaged in only ordinary competition with plaintiff. This is why I believe the better course would be to remand this matter (as plaintiff alternatively requested in the supplemental briefing we ordered to address the Fourth District's rejection of the LBI test in *Sunbelt*) to allow the trial court to take any necessary additional evidence and to reconsider the evidence already presented in light of the correct legal standard. Barring that, I agree with the special concurrence that the parties are free to make further arguments in support of remanding this matter to the trial court in a petition for rehearing to us.

The lead opinion contends that the dissent is trying to engraft the principles of the tort breach of fiduciary duty onto the consideration of the validity of a restrictive covenant. This is plainly mistaken. My focus is on the level of competition. The lead opinion's hyperbolic contentions should be ignored and should not be allowed to cloud the issue of the degree of competition. Indeed, the degree of competition posed by defendants is precisely the sort of thing that exists outside of the LBI test, but is something that I, the special concurrence, and the three judges on *Steam Sales* all agree should be considered by the court under the totality of the circumstances when it is reviewing the validity of a restrictive covenant.

I also note that the lead opinion cites to *The Agency, Inc. v. Grove*, 362 Ill. App. 3d 206, 215 (2005), and criticizes the fact that I do not acknowledge the manifest-weight-of-the-evidence standard of review regarding the trial court's consideration of the existence of a protectable interest. As I have noted above, the trial court used the wrong legal standard by which to judge whether there was a protectable interest. The trial court used the LBI test, but the special concurrence

and I believe that the trial court should have examined all of the circumstances of the case in determining whether a protectable interest existed. As a result, its factual findings, such as the presence or lack of a protectable interest, are flawed because, under the LBI test, the relevant evidence is narrow indeed. Because I am looking at the record through the lens of a different legal standard (totality of the circumstances as opposed to the LBI test), I am considering evidence that was not relevant to the LBI test and was not passed upon by the trial court for the purpose of establishing the existence or lack of a protectable interest. Hence, my repeated calls to remand this matter. Further, to explain my position and to properly analyze this case using the correct legal standard, I am required to review pertinent evidence in the record that the trial court, under the previous and now superseded standard, could not consider. Contrary to the lead opinion's assertion, I am not erring by abandoning the proper standard of review for factual matters; rather I am trying to implement the correct standard here, one that takes into account all of the evidence of record.

Having determined that plaintiff has a protectable interest in not being subjected to the extraordinary competition of its former employees selling the same goods and services to the same customers, I turn to the time, territory, and activity restrictions in the restrictive covenant, which the lead opinion never analyzes because it holds there was no protectable interest in the first place. The restrictive covenant at issue here contains both a noncompetition clause as well as several nonsolicitation clauses. 405 Ill. App. 3d at 720. The time, territory, and activity terms are defined similarly in the noncompetition and nonsolicitation clauses.

Beginning with the noncompetition clause, it prohibits competitive activities in the entirety of Wisconsin, Illinois, and Indiana. Evidence was adduced that plaintiff did about 95% of its business in the greater Chicago area. The territorial scope appears to be broader than the bulk of plaintiff's actual business interests, and it should weigh against the validity of the restrictive covenant.

Plaintiff urges, however, that the territorial scope supports the validity of the restrictive covenant. Plaintiff argued, in oral argument, that the restrictive covenant's geographical scope is tempered because the focus of the limitation is on its recent customers. In other words, plaintiff contended that defendants could set up shop anywhere, even next door, so long as they did not do business with plaintiff's recent customers. This argument is somewhat appealing, and yet it seems to violate principles of contract interpretation, because it seems to render the territorial term of the covenant superfluous. A closer look belies the concern.

Plaintiff drafted the restrictive covenant to prohibit defendants from "[e]ngag[ing] in any sales, sales support, or sales supervisory capacity in any business in the states of Illinois, Indiana or Wisconsin which sells [anything plaintiff is selling or has sold during Arredondo and Garcia's tenure] to or for any person or entity who or which was a customer [of plaintiff]." A customer of plaintiff is determined as of the termination date plus 12 months before the termination date. A reading of the covenant confirms plaintiff's contention: defendants are prohibited from competing in the three states by selling anything plaintiff sells to or for a recent customer of plaintiff. If defendants are selling to a noncustomer of plaintiff, even something that plaintiff sells or sold, then there is no conflict with the covenant, and this activity may occur anywhere in any and all of the three states. By including terms that prohibit defendants from performing similar functions for companies doing business with current or recent customers, plaintiff narrows the geographical range of the covenant so that it is exactly coextensive with plaintiff's recent customer base at the time of the termination. In fact, the geographic limitation itself is limited by applying only to recent customers, thus excluding from the limitation everyone else in the geographic area. There was no evidence that plaintiff had even a significant let alone a huge market share, so the limitation on the geographic limitation leaves abundant potential customers for defendants. Thus, in the words of *Mohanty*, the geographic limitation here is, in fact, "narrowly circumscribed." See *Mohanty*, 225 Ill. 2d at 76-77 (appellate court found that the plaintiffs were free to practice medicine outside of the geographic limitation " 'which, given the heavily populated Chicago metropolitan area, would not deprive them of employment' "; supreme court held that geographic limitation was not greater than necessary to protect the defendants' interests because "the restriction on [the] plaintiffs is in effect only within a narrowly circumscribed area of a large metropolitan area"). Since the covenant's territorial limitation in this case is also narrowly circumscribed, albeit in a different fashion, it is therefore reasonable and enforceable.

For example, consider an employer whose customers are all in Portland, Maine, but whose noncompetition covenant also restricts a former employee from selling to the employer's customers in Portland, Oregon. The reasonableness test is applied as follows: (1) the restriction on sales to customers in Portland, Oregon, does not harm the employee at all, much less unduly harm him, because there are no employer's customers in Portland, Oregon, so the employee can make sales to anyone in Portland, Oregon; (2) for the same reason there is no harm to the public; and (3) the restriction does go beyond what is

needed to protect the employer's legitimate interests, but is actually harmless. The result is that that particular geographical limitation would not render the noncompetition covenant unenforceable.

I note that the time restriction of the noncompetition clause is one year. There is no serious argument that the time limitation is not reasonable. See *Mohanty*, 225 Ill. 2d at 78 (upholding a three- or five-year limitation); *Sunbelt*, 394 Ill. App. 3d at 432 (one-year limitation found to be reasonable). I would find that the time restriction in the noncompetition clause here is reasonable and enforceable.

I next consider the scope of the activities prohibited by the restrictive covenant. The covenant provides that defendants are prohibited from "[e]ngag[ing] in any sales, sales support or sales supervisory capacity in any business [which sells the same things that plaintiff sells or sold during Arredondo and Garcia's tenure] to or for any entity who or which was a customer [of plaintiff at the termination date or within 12 months before the termination date] or obtain or acquire any interest (whether as debt or equity), or provide services (whether as an employee, consultant or otherwise), in or to any such business." The covenant prohibits defendants from plying their trade with any business like plaintiff's (including a business created by defendants) that sold products to or for any person or business who or which was one of plaintiff's recent customers. Again, the current-or-recent-customer-centric language limits the scope of the prohibition. The covenant also includes language prohibiting defendants from acquiring any interest in a business like plaintiff's that sold products to or for a recent customer, and language prohibiting defendants from providing services (the type of which is unspecified) in any capacity to a business like plaintiff that sold products to or for a recent customer of plaintiff.

Restrictions on activities in a covenant not to compete should be narrowly tailored to protect the employer only against activities that threaten its legitimate interests. *Cambridge Engineering, Inc. v. Mercury Partners 90 BI, Inc.*, 378 Ill. App. 3d 437, 452 (2007). Here, the covenant bars defendants from engaging in any sales-related activity with plaintiff's recent customers. This appears to be reasonable, as Arredondo and Garcia were salesmen for plaintiff. See *Cambridge Engineering*, 378 Ill. App. 3d at 452. However, the covenant also prohibits defendants from providing "services" to any business that dealt with a recent customer of plaintiff. The term "services" is unspecified and is broad enough to encompass any conceivable position, such as a position unrelated to sales or even a janitorial position. (Proper interpretation suggests that it is any position other than the

sales-related activities expressly prohibited in the noncompetition clause.) Because the prohibition is so broad, it cannot be deemed to be narrowly tailored to protect plaintiff's legitimate interests. The overbreadth of the restrictive covenant is beyond the standard for acceptable activity restrictions. *Cambridge Engineering*, 378 Ill. App. 3d at 452; *Lawrence & Allen*, 292 Ill. App. 3d at 140. Accordingly, I would find the noncompetition covenant to be unenforceable only if the services language is allowed to stand.

Plaintiff requested the trial court to "blue pencil" the covenant so as to make it enforceable. I would accept plaintiff's invitation and strike the services language. With that modification, then, I believe that the noncompetition clause is fully enforceable. It would be narrowly tailored because it would prohibit defendants from directly competing with plaintiff for the business of customers who purchased from plaintiff within 12 months of Arredondo and Garcia's termination date. Moreover, the services language is not really at issue here, because Arredondo and Garcia competed as salesmen.

The reasonableness is especially clearly seen when *Mohanty* is considered. *Mohanty* prohibited the plaintiff employees, who specialized in cardiology, from practicing any medicine in the geographic area specified. *Mohanty* justified this because the physicians were licensed to practice medicine, not just their specialties, and they were free to practice medicine outside of the territorial limitation of three or five miles, which, given the heavy population in the Chicago metropolitan area, would not deprive the employees of the ability to find employment. *Mohanty*, 225 Ill. 2d at 76. Likewise here. By striking the services language, the activities prohibited are related to Arredondo and Garcia's former positions—sales. Additionally, the territorial restriction is expressly coextensive with plaintiff's sales area, because defendants are prohibited from competing for the business of any of plaintiff's customers who purchased anything from plaintiff in the 12 months preceding Arredondo and Garcia's termination date. Defendants remain free to sell the identical products and services to entities that have not been recent customers of plaintiff, and defendants could open up their business literally next door to plaintiff. Furthermore, in *Mohanty*, the employees were prohibited, not only from treating their own patients and any other patients of the employers, but also from treating any person, even a person who had no prior relationship with the employers. The restriction in *Mohanty*, which was deemed enforceable, was a much broader restriction than we have in this case. Thus, I conclude that the activity restriction is reasonable if the services term is stricken.

I next consider the nonsolicitation clauses in the restrictive covenant. The first nonsolicitation clause bars defendants from soliciting or assisting others to solicit "sales from any person or entity who or which was a customer [of plaintiff]." "Customer" is defined in the same fashion as it was defined in the noncompetition clause considered above. Much like a noncompetition clause, a nonsolicitation clause is deemed valid only if it is reasonably related to the employer's interest in protecting customer relations that the employee developed while working for the employer. *Cambridge Engineering*, 378 Ill. App. 3d at 455. The general rule was that a court will not enforce a nonsolicitation clause that prohibits a former employee from working with customers that he or she never had contact with while working for the original employer. *Cambridge Engineering*, 378 Ill. App. 3d at 455; *Lawrence & Allen*, 292 Ill. App. 3d at 138. However, I doubt the viability of such a rule in light of *Mohanty*. In any event, the general rule does not seem applicable here. Even though plaintiff defines "customer," not in terms of who Arredondo and Garcia may have worked with during their employment, but as any customer of plaintiff on the date of termination or within the 12 months before the date of termination, the validity of the noncompetition clause as modified seems to render the nonsolicitation clause redundant. Further, it makes no sense to bar defendants from making actual sales to plaintiff's recent customers yet to allow them to solicit those very same customers. The result comes about, I think, because the nonsolicitation clause and the noncompetition clause define the activities restricted in terms of plaintiff's recent customers. In my view, then, applying the general rule would lead to a patently absurd result; however, we will not construe such a provision to reach an absurd result. See *Farmers Automobile Insurance Ass'n v. Rowland*, 379 Ill. App. 3d 696, 698 (2008) (a contract will not be construed to permit an absurd result). Accordingly, I would hold that the first nonsolicitation clause is enforceable.

Likewise, the second nonsolicitation clause prohibits defendants from "[s]olicit[ing] (or assist[ing] others in soliciting), referrals from any person or entity who or which referred business to [plaintiff within 12 months of Arredondo and Garcia's termination]." Once again, the limitation of the clause to a person or entity who or which successfully referred business to plaintiff in the 12 months preceding Arredondo and Garcia's termination renders it enforceable for the same reasons as the previous nonsolicitation clause.

Finally, the third nonsolicitation clause prohibits defendants from poaching plaintiff's employees. This clause appears to be sound. Plaintiff has a protectable interest in its employees, and I see nothing

in the nonpoaching clause that is overbroad or otherwise unreasonable, keeping in mind that the duration of the covenant as a whole is limited to one year. Had there not been a time limitation, then the nonpoaching clause would be problematic, as I do not believe that plaintiff's interest in preventing former employees from poaching current employees should last forever. See *Lawrence & Allen*, 292 Ill. App. 3d at 139-40 (discussing valid time limits in nonsolicitation clauses). Thus, I believe that plaintiff has demonstrated a protectable interest and that the time, territory, and activity restrictions (as modified) are reasonable. Consequently I would enforce the restrictive covenant, and I therefore dissent from the result reached by the lead opinion and the special concurrence.

The lead opinion contends that the dissent attempts to undermine the necessity of demonstrating a protectable interest. 405 Ill. App. 3d at 740-42. Unlike the lead opinion, the special concurrence and the dissent are abandoning the narrow and restrictive prongs of the LBI test. Instead of near-permanency and confidentiality, the facts of this case lend themselves to a consideration of whether the competition posed by defendants can be deemed to be ordinary, leaving plaintiff undeserving of protection, or whether the competition is fiercer than ordinary, or unfair in some manner, thereby deserving enforcement of the restrictive covenant. Thus, the dissent does not go further than *Sunbelt* (405 Ill. App. 3d at 741) or the special concurrence, because it keys the protectable interest to the manner or level of competition.

Before concluding, however, I am compelled by the disjointed and confusing nature of the three opinions in this case to expand upon my explanation of where the majorities lie in our three opinions. In my view, courts of review should avoid, when possible, issuing confusing statements of what the law is. The name for this policy when applied to courts of equal authority is "horizontal *stare decisis.*" *O'Casek v. Children's Home & Aid Society of Illinois*, 229 Ill. 2d 421, 453 n.4 (2008) (Karmeier, J., dissenting, joined by Thomas, C.J., and Garman, J.). I say, "when possible," because it is not always possible. But on those occasions when we depart from precedent, it is imperative that we do so clearly by expressly recognizing that we are doing so and explaining why. This is part and parcel of why we explain our decisions rather than just giving thumbs up or thumbs down when we decide appeals. Our job is not to rule just on the case before us, but to provide guidance as to what the law is for the benefit of the courts as well as the body politic in the conduct of its affairs. Clarity rather than confusion is our goal. We have fallen far short of that goal today.

766

What is the law in Illinois today regarding the LBI test according to the unified Appellate Court of Illinois?[9] Until today, it was contained in *Sunbelt*, 394 Ill. App. 3d at 431, which declined, expressly, to adhere to the principle of horizontal *stare decisis* and concluded that the LBI test was flawed and should not be used. The unanimous decision in *Sunbelt* went to great lengths to justify its departure from precedent, pointing out, among other things, that the LBI test had never been embraced by our supreme court. Right or wrong, *Sunbelt* was clear. Our decision today lacks the virtue of clarity; it will serve only to confuse bench and bar and the employers and employees of Illinois. First, the lead opinion expresses the majority in result alone. The special concurrence quite effectively repudiates the lead opinion's view of the LBI test. It is clear that the special concurrence, and the authority that it cites, does not agree with the lead opinion that the LBI test is somehow flexible and not outcome-determinative. I completely agree with the special concurrence that the LBI test is no longer viable and should be abandoned. The lead opinion, simply by coming first, obscures that holding of our court today. I note, too, that a completely separate panel of this court recently issued *Steam Sales*, 405 Ill. App. 3d at 457-58, which expressly disagreed with the lead opinion's view that the LBI test is somehow flexible:

> "[T]he legitimate-business-interest test is outcome-determinative in cases where the employer is unable to establish either a near-permanent relationship or the attainment of confidential information. Unless one of these two criteria is satisfied, the employer cannot establish a legitimate business interest, since the test contemplates no other means of showing a protectable interest. The legitimate-business-interest test therefore presents a greater hurdle for employers to overcome than the reasonableness test [set forth in *Mohanty*]. In other words, a restraint that is reasonable in terms of time and territory will still not be enforceable if the employer is unable to establish a legitimate business interest (*i.e.*, a near-permanent relationship or confidentiality). Doing away with the legitimate-business-interest test would not relieve an employer of demonstrating a protectable interest; it would simply allow for a more contextual approach dependent on the particular facts and

---

[9]There is but one appellate court in Illinois (*People v. Granados*, 172 Ill. 2d 358, 371 (1996)), and even though the appellate court is divided into five districts, the districts have nothing to do with the appellate court's authority because the five districts define the political units from which the judges of the supreme and appellate courts are selected (*Aleckson v. Village of Round Lake Park*, 176 Ill. 2d 82, 94 (1997) (Harrison, J., specially concurring, joined by Heiple, C.J.)).

circumstances of the case. Therefore, to the extent that *Sunbelt* can be interpreted to require analysis of *only* the time and territory aspect of a restraint (see *Sunbelt*, 394 Ill. App. 3d at 431 ('courts at any level, when presented with the issue of whether a restrictive covenant should be enforced, should evaluate only the time-and-territory restrictions contained therein')), we note that the reasonableness of time and territory should still be evaluated *in relation to a protectable interest.* But because of the 'gatekeeper' function of the legitimate-business-interest test, which precludes consideration of time and territory absent a near-permanent relationship or confidentiality, *Sunbelt*'s rejection of that test does merit some consideration." (Emphases in original.)

So, back to the question of what is the state of the LBI test in Illinois. *Sunbelt*, *Steam Sales*, and the majority of the three justices on *Reliable* all disagree with the lead opinion's view of the LBI test as flexible. The bench and bar are left to count heads, assuming they have the stamina to wade through the confusion engendered by the lead opinion. The view of the majority of the judges of the Second District is known as expressed in *Steam Sales* and *Reliable*. Mindful that we are a unified appellate court (*Granados*, 172 Ill. 2d at 371), the bench and bar (and the employers and employees) must also look to *Sunbelt*'s unanimous decision.

The lead opinion claims that the dissent advocates that *Sunbelt* be followed. 405 Ill. App. 3d at 741. I would hope that my intent to follow the lead of the special concurrence and craft a responsive-to-the-circumstances test for analyzing the validity of restrictive covenants was as clear as the language I used to state that I was not following *Sunbelt*. *E.g.*, 405 Ill. App. 3d at 755, quoting 405 Ill. App. 3d at 749, quoting *Sunbelt*, 394 Ill. App. 3d at 431 ("I further agree completely with the special concurrence's repudiation of *Sunbelt*'s holding [about evaluating a restrictive covenant with respect to] ' "*only* the time-and-territory restrictions" ' " (emphasis in original)). In any event, contrary to the lead opinion's thoughts, I believe that *Sunbelt, Steam Sales*, and the special concurrence and dissent here all herald a departure from the formalistic application of the LBI test. As *Sunbelt* quite properly noted, the LBI test is an appellate court gloss and has not been embraced by our supreme court. To the extent that *Sunbelt* repudiates the LBI test, it should be followed, as I have outlined above.

The special concurrence and this dissent in this case are in agreement with the statements regarding the viability of the LBI test in *Steam Sales* and *Sunbelt*. Given the physical location of the special concurrence and dissent, and given the incorrect denomination of the lead opinion as the majority, caused by placing that opinion in the

primary position over the special concurrence, a casual reader might conclude that the nominal "majority" in this case is at odds with the prevailing view of the Second District as well as the view of the unified Appellate Court of Illinois. I have attempted to make clear where the actual majorities are in this case to dispel the confusion caused by the arrangement of our three opinions in this matter. Obviously, one of the worst things this court can do with regard to the parties in a particular case is to reach the wrong result. Perhaps one of the worst things we can do with regard to the bench, bar, and general public is to issue confusing statements of the law. Here, I think we have done both. The lead opinion and special concurrence agree (wrongly, in my view) that the restrictive covenant must not be enforced. The special concurrence and dissent agree that the LBI test should be abandoned in favor of a totality-of-the-circumstances determination of the existence of a protectable interest, a majority holding that is obscured by the arrangement of the three opinions in this case, thereby serving only to confuse the bench and bar (although I hope that the bench and bar's confusion is alleviated by this explanation). I therefore respectfully submit these remarks, concurring with whom and where as noted, and dissenting with whom and where as noted, in the hope of minimizing, if not repairing, the confusion that must inevitably arise from the arrangement of the three opinions submitted in this case.

The obvious course to prevent all of this confusion would be for Justice Hudson to write the lead opinion. Presiding Justice Zenoff could then write a typical special concurrence explaining that she agrees with Justice Hudson's result for a different reason, and I could dissent to say that I disagree with the result but agree with Justice Hudson's articulation of the law. This structure would convey to bench and bar a clear picture of the rejection of the LBI test by a majority of this panel as set forth in a lead opinion by Justice Hudson and endorsed by me.

The lead opinion offers no explanation for why this logical course has not been followed. I note that the lead opinion stiffly notes that "[s]eparate opinions are designated as special concurrences or dissents solely based upon their authors' agreement or disagreement with the judgment entered by the majority—not the rationale for that judgment." 405 Ill. App. 3d at 743. Labeling aside, I note that, as to a special concurrence, precisely the opposite is true. An opinion is designated a special concurrence because it agrees with the judgment of the court but not the rationale. Similarly, a dissent will frequently agree with the legal test to be applied, but will disagree with the conclusion. Obviously, the better practice would be to combine both the judgment and the rationale for that judgment in the same opinion.

Here, the special concurrence combines both the majority judgment and the majority rationale for that judgment. This fact completely repudiates the lead opinion's contention, as well as its pretension to majority status.

Nevertheless, I observe that this is not the first time this court has inexplicably placed a minority view in a "majority" opinion. In another recent case, *Snyder v. Heidelberger*, 403 Ill. App. 3d 974 (2010), Justice McLaren wrote the "majority" opinion even though, as I explained in my dissent, Justice Jorgensen's special concurrence actually represented the majority view of the court. In my dissent, I questioned the illogical structure of the opinion, and I predicted that it would cause undue confusion for bench and bar. Indeed, not two weeks after *Snyder*'s publication, at least one published case summary mistook Justice McLaren's "majority" opinion for the opinion of the court. *Case Summaries*, Chi. Daily L. Bull., August 20, 2010, at 1, 4. This decision will inevitably spawn similar unnecessary confusion.

This strange trend of allowing a judge with a minority view to author a majority opinion has but one possible explanation: it must be a result of our much-criticized practice of assigning one judge authorship of a decision before the full panel has discussed the appeal. As has been argued, this practice "encourages one-judge decisions and one-judge opinions" by causing panel judges to "give too much deference *** to the judge who has been assigned the opinion." R. Aldisert, Opinion Writing §3.4, at 34 (1990). Since "[t]he term 'collegiality' generally refers to the ideal of judges on a court or panel reaching a decision through a collaborative exchange in which the views of every judge contribute to the court's final understanding of the issues and resolution of the case," our practice "can inhibit collegiality by fostering excessive reliance on information provided by the assigned judge, who will have developed a proprietary interest in the draft opinion." M. Hummels, *Distributing Draft Opinions Before Arguments on Appeal: Should the Court Tip Its Tentative Hand? The Case for Dissemination*, 46 Ariz. L. Rev. 317, 332 n.124 (2004); see also M. Ross, *Reflections on Appellate Courts: An Appellate Advocate's Thoughts for Judges*, 8 J. App. Prac. & Process 355, 370 (2006) ("the ABA cautions against draft decisions written by a judge before conferencing with other members of the panel because the decision may not be a product of collegiality"), citing ABA Comm. On Standards of Judicial Administration §3.30 (1977).

Even among those courts that follow this criticized practice, the assigned author does not retain majority authorship once her view is exposed as a minority view. As this decision demonstrates, however, this court has such strong allegiance to the practice that it protects a

judge's "author" designation even where that judge has a unique view of the case. Thus, as here, the court protects the status of the assigned author, at the cost of muddling the law we publish our opinions to clarify. I have resigned myself to the fact that the court's general practice of avoiding the collegial process will not change, regardless of any protestations from me or from the practice's many critics. However, I cannot fathom how that practice can be elevated to the point that it supersedes our duty to provide clear explanations of our decisions to bench and bar.